PALM BEACH TRUST COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 9569. Promulgated November 28, 1947

*B. H. Bartholow, Esq.*, for the petitioner.
*Thomas R. Charshee, Esq.*, for the respondent.

## OPINION.

OPPER, *Judge*: Whether petitioner is a personal holding company under section 501, Internal Revenue Code, depends entirely upon its ability to qualify as "a bank," within the excepting language of section 501 (b), the type of income actually received and the distribution of stock ownership being concededly otherwise encompassed by the defining provisions. For the definition of "a bank" we are referred to section 104, which is as follows:

(a) DEFINITION.—As used in this section the term "bank" means a bank or trust company incorporated and doing business under the laws of the United States (including laws relating to the District of Columbia), of any State, or of any Territory, a substantial part of the business of which consists of receiving deposits and making loans and discounts, or of exercising fiduciary powers similar to those permitted to national banks under section 11 (k) of the Federal Reserve Act, 38 Stat. 262 (U. S. C., Title 12, § 248k), as amended, and which is subject by law to supervision and examination by State, Territorial or Federal authority having supervision over banking institutions,

Since petitioner is incorporated as a trust company under Florida law and is subject by law to supervision by the banking authorities of that state, but does not receive deposits nor make loans or discounts, the parties join issue in substance on whether "a substantial part" of petitioner's "business" consists of "exercising fiduciary powers similar to those permitted to national banks."[1]

Petitioner's operations in the fiduciary field consisted of acting as trustee under certificates of beneficial interest covering mortgages held by it for the benefit of its stockholders and their children and grandchildren, and of collecting and transmitting payments of principal and interest thereunder. During the tax year there were 15 such mortgages totaling $300,000, on which about 50 collections aggregating some $90,000 were made. It is stipulated that petitioner rendered no bill and received no income for these services.

Even if it was contemplated that petitioner was eventually to be paid for these activities, a conclusion which the record by no means demonstrates,[2] its conduct of the mortgage operations, restricted and informal as they evidently were, can scarcely be considered a part of its business, certainly not a "substantial" part. The pursuit of an activity for profit is indispensably associated with the concept of "business." *Flint* v. *Stone Tracy Co.*, 220 U. S. 107. As was said in *Chaloner* v. *Helvering* (App. D. C.), 69 Fed. (2d) 571, "it is essential that livelihood or profit be at least one of the purposes for which the employment is pursued." It is impossible to envisage a true business, conducted with the public at arm's length, being successfully operated along these lines, at least to any substantial extent, where for a period of four years, although to some undisclosed degree theoretically collectible, fees were neither billed nor withheld. Only the stipulated fact that petitioner paid no salaries can account for the continuation of these practices, but that factor does nothing to substantiate the similarity to a true business.

---

[1] Federal Reserve Act, 12 U. S. C., § 248 (k) :

"(k) Permitting national banks to act as trustees, etc. To grant by special permit to national banks applying therefor, when not in contravention of State or local law, the right to act as trustee, executor, administrator, registrar of stocks and bonds, guardian of estates, assignee, receiver, committee of estates of lunatics, or in any other fiduciary capacity in which State banks, trust companies, or other corporations which come into competition with national banks are permitted to act under the laws of the State in which the national bank is located.

\*          \*          \*          \*          \*          \*          \*

"In passing upon applications for permission to exercise the powers enumerated in this subsection, the Federal Reserve Board may take into consideration the amount of capital and surplus of the applying bank, whether or not such capital and surplus is sufficient under the circumstances of the case, the needs of the community to be served, and any other facts and circumstances that seem to it proper, and may grant or refuse the application accordingly :   \*   \*   \*\*"

[2] In an undisclosed portion of the "Trust Agreements," it was provided that "The reasonable fees and expenses of the trustee shall be paid" and that "the amount thereof may be withheld \* \* \* from any moneys \* \* \* collected." This was apparently never done.

That it was not the purpose in excepting "banks" to exclude such restricted and intimate family ventures seems apparent not only from this consideration of the legislative language, but also from the purpose to be served. The reason why Congress enacted the cognate exception of "banks" from the operation of the undistributed surplus tax (section 104 (b)) "is succinctly stated in the Report of the Committee on Ways and Means, H. R. No. 2475, 74th Cong.: "* * * *This seems to be a wise public policy, since the surplus of banks must be built up for the protection of the depositors* * * *". * * * The imposition of an additional tax on the undistributed earnings of a banking institution would have been equivalent to flying in the face of the settled policy of banking authorities requiring the establishment of reserves, out of the bulk of earnings, for the safety and protection of the depositing public." *Staunton Industrial Loan Corporation* v. *Commissioner* (C. C. A., 4th Cir.), 120 Fed. (2d) 930. No such public purpose is present on these facts, and the conclusion seems to be required that petitioner, not being a bank within the meaning of the defining section, was during the period in issue a personal holding company.

This determination necessitates disposition of the remaining questions. The first is whether petitioner's sale of city of Miami certificates of indebtedness received in lieu of interest in connection with a refunding of that city's obligations represented the realization of tax-exempt interest on such obligations or taxable capital gain to the extent of the difference between their fair market value when acquired and the sale price.

That petitioner collected the proceeds of these securities by sale rather than awaiting their maturity must be treated as entirely fortuitous. Collection from the purchaser upon a transfer of tax-exempt interest does not deprive the receipt of its original character. I. T. 1337, I-1 C. B. 29. See *H. Gates Lloyd*, 4 T. C. 829, 838; aff'd. (C. C. A., 3d Cir.), 154 Fed. (2d) 643; certiorari denied, 329 U. S. 717. Yet we think respondent would never have sought to tax the proceeds of these certificates had they been held to maturity and surrendered for payment by the municipality. So much was, indeed, conceded by respondent's counsel at the hearing: "Well, if the petitioner had held these two percent certificates until maturity and were paid the interest by the corporation that would have been tax-exempt interest * * *."

It is stipulated that all of the certificates in controversy were issued either "To evidence the past due interest on" the municipality's original securities or "to evidence the uncancelled semi-annual interest" on the new refunding bonds issued in exchange. All of this interest, if received in cash, would have been tax exempt. That it was

actually collected through subsequent disposition of an obligation intended merely to represent it seems to us ineffectual to alter the fundamental nature of the income. To this extent the deficiency is disapproved.

On the penalty issue no evidence whatever was introduced. We know that petitioner failed to file a personal holding company return, but there is no testimony and no record to tell us why this statutory requirement was omitted. Petitioner's sole contention on the subject is that it obviously was of the opinion that it was not a personal holding company because it answered "no" to that question on the income tax return; and that the arguable nature of its liability as a personal holding company made this opinion reasonable. This is said to be the "reasonable cause" for failing to file a return which the penalty section describes, and to demonstrate that there was no "willful neglect."

Were we to accept this reasoning and eliminate the penalty, it would mean that whenever a taxpayer stated on its income tax return that it was not a personal holding company, and its liability as a personal holding company was not entirely clear, no penalty would attach, regardless of what steps the taxpayer had taken to investigate the question and of the actual state of mind of the taxpayer or its responsible officers, and irrespective of whether the information called for was otherwise available to respondent, and, indeed, of the taxpayer's motives or good faith in withholding it. We know of no case which can be said to have gone to any such lengths.

The present petitioner does not seem to us to have sustained its burden of showing, as the statute requires, that the failure to file the personal holding company return was due to reasonable cause and not to willful neglect. We think the penalty was properly imposed.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

JOHNSON, *J.*, dissenting: Provisions of the Internal Revenue Code imposing a surtax on undistributed income of personal holding companies are penal in character, and for this reason should be strictly construed, *Knight Newspapers* v. *Commissioner* (C. C. A., 6th Cir.), 143 Fed. (2d) 1007; *Pembroke Realty & Securities Corporation* v. *Commissioner* (C. C. A., 2d Cir.), 122 Fed. (2d) 252. Under Florida law petitioner was organized and operated as a bank and falls literally within the definition of a bank contained in section 104 (a), Internal Revenue Code. By section 501 (b) the term "personal holding company" does not include "(2) A bank as defined in section 104." In the majority's opinion, nonetheless, petitioner is classed as a personal holding company because it failed to collect fees for its services and because

the Congress' expressed purpose in excepting banks from personal holding company classification would not apparently be furthered by excepting petitioner. These reasons, in my opinion, impute to the quoted sections limitations which Congress did not enact and which a court may not judicially add.

Believing that petitioner was not a personal holding company, I dissent *a fortiori* from the majority's approval of the imposition of a penalty for failure to file a personal holding company tax return. Petitioner's obligation to do so was at best doubtful; apparently it had not filed any in prior years and the Commissioner had not required it to do so, and, while state law is not determinative of classification under the Federal revenue acts, petitioner's status as a supervised Florida bank lent plausible color to an honest belief that it fell within the specific exception of section 501 (b) (2). Failure to file under such circumstances was due in my opinion to "reasonable cause," not to "willful neglect." I do not agree that elimination of the penalty here would require elimination of the penalty in all cases where classification "was not entirely clear," as stated by the majority. This Court can decide whether doubts were reasonable on the facts established in each case presented.

ARUNDELL, *J.*, dissenting: I would not under the facts as they appear in this case impose a penalty.