STEVENS BROS. FOUNDATION, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 89120.    Filed October 16, 1962.

*John M. Sullivan, Esq.*, and *Frank J. Hammond, Esq.*, for the respondent.

*Donald W. Wolf, Esq.*, for the petitioner.

TRAIN, *Judge:* Respondent determined deficiencies in income and personal holding company taxes and additions to tax of the petitioner as follows:

| Fiscal year ended Mar. 31— | Deficiency | Addition to the tax | |
|---|---|---|---|
| | | Sec. 291(a) I.R.C. 1939 | Sec. 6651(a) I.R.C. 1954 |
| | *Income tax* | | |
| 1948 | $21,634.48 | $5,408.62 | |
| 1949 | 5,013.28 | 1,253.32 | |
| 1950 | 28,025.41 | 7,006.35 | |
| 1951 | 5,258.17 | 1,314.54 | |
| 1952 | 2,135.97 | 533.99 | |
| 1953 | 1,623.29 | 405.82 | |
| 1954 | 1,300.55 | 325.14 | |
| 1955 | 44,158.44 | | $11,039.61 |
| 1956 | 8,372.55 | | 2,093.14 |
| 1957 | 15,541.64 | | 3,885.41 |
| 1958 | 15,188.93 | | 3,797.23 |
| | *Personal holding company surtax* | | |
| 1948 | $73,308.62 | 18,327.16 | |
| 1952 | 39,960.04 | 9,990.01 | |
| 1953 | 30,462.05 | 7,615.51 | |
| 1954 | 23,591.88 | 5,897.97 | |

Respondent has conceded the inapplicability of the additions to tax under section 6651(a) of the Internal Revenue Code of 1954 for petitioner's taxable years 1955 through 1958.

The issues remaining [1] to be decided are:

(1) Whether respondent is barred by the statute of limitations from asserting deficiencies and additions to tax for each of petitioner's taxable years 1948 through 1954;

(2) Whether respondent is estopped from retroactively revoking in 1954 his 1947 ruling that petitioner was exempt from taxation as a charitable organization;

(3) Whether petitioner was exempt from taxation as a charitable organization under section 101(6) of the Internal Revenue Code of 1939 during each of its taxable years 1948 through 1954 and under section 501(c)(3) of the Internal Revenue Code of 1954 during each of its taxable years 1955 through 1958;

---

[1] Other matters raised by the pleadings were neither argued on brief nor listed on brief among the remaining issues. We assume they have been abandoned.

(4) Whether petitioner is liable for personal holding company surtax pursuant to section 500 of the Internal Revenue Code of 1939 for each of its taxable years 1948, 1952, 1953, and 1954, and for personal holding company tax pursuant to section 541 of the Internal Revenue Code of 1954 for each of its taxable years 1955 through 1958;

(5) Whether a claimed capital loss on account of worthlessness of securities in the amount of $9,849.40 was properly disallowed for petitioner's taxable year 1949;

(6) Whether interest expense in the amount of $5,308.33 was properly disallowed for petitioner's taxable year 1950;

(7) Whether income from the Algiers Lock projects should have been reported in the amounts of $34,252.39, $87,203.91, and $31,153.01 in petitioner's taxable years 1949, 1950, and 1951, respectively, rather than in the amounts of $128,410.60 and $24,198.71 in petitioner's taxable years 1950 and 1951, respectively;

(8) Whether, in its taxable year 1955, petitioner received from the Cheatham Lock project ordinary income of $25,778.24 rather than a long-term capital gain of $48,306.44 and an ordinary loss of $22,528.20; and

(9) Whether petitioner is liable for additions to tax under section 291(a) of the 1939 Code for failure to file income tax returns for each of its taxable years 1948 through 1954 and for failure to file personal holding company tax returns for each of its taxable years 1948, 1952, 1953, and 1954.

FINDINGS OF FACT.

The facts stipulated to by the parties are incorporated herein by reference and found as stipulated.

Stevens Bros. Foundation, Inc., the petitioner herein, was incorporated under the laws of Delaware on December 31, 1942. Its principal office is located in St. Paul, Minnesota.

Petitioner's fiscal years and each of its taxable years before us end on March 31. Petitioner keeps its books and records on the cash basis, except as to its profits on the Cheatham Lock project, *infra*. It timely filed a Form 990 (exempt organization information return) for each of its taxable years 1948 through 1951 with the collector of internal revenue for the district of Minnesota; it filed a Form 990-A for each of its taxable years 1952 through 1954 with the collector of internal revenue, director of internal revenue, and district director of internal revenue for the district of Minnesota, respectively; and it filed a timely corporation income tax return for each of its taxable years 1955 through 1958 with the district director of internal revenue for the district of Minnesota. Each of the above-mentioned Form 990 and Form 990-A returns lacked data necessary for the computation and assessment of deficiencies.

Stevens Bros. & The Miller-Hutchinson Co., Inc. (hereinafter sometimes referred to as Corporation), and petitioner filed a partnership information return for the calendar year 1949 with the collector of internal revenue for the district of Louisiana and for each of the calendar years 1950 through 1954 with the appropriate collector, director, or district director of internal revenue for the district of Tennessee.

Petitioner's certificate of incorporation, which was not amended between the time of its issuance and the end of the last taxable year before the Court, reads, in pertinent part, as follows:

FIRST. The name of this corporation is STEVENS BROS. FOUNDATION INC.

*      *      *      *      *      *      *

THIRD. The nature of the business and the objects and purposes to be transacted, promoted and carried on are to do any or all of the things herein mentioned as fully and to the same extent as natural persons might or could do, and in any part of the world, viz.:

To engage in charitable, educational and public welfare activities of any and all kinds; and to accept and receive property of any and all kinds by gift, devise, trust agreement, bequest or otherwise.

To hold, purchase, mortgage or convey real and personal property within or without the State of Delaware; to institute, participate in, promote or carry on commercial, mercantile, financial, industrial, mining, construction and engineering enterprises and operations and to conduct all businesses appurtenant thereto.

To purchase or otherwise acquire, register, hold, use, sell or in any manner dispose of and to grant licenses or other rights and in any manner deal in and with processes, formulas, trade-marks, trade names, patents and copyrights.

*      *      *      *      *      *      *

The objects and purposes specified herein shall be regarded as independent objects and purposes and, except where otherwise expressed, shall be in no way limited nor restricted by reference to or inference from the terms of any other clause or paragraph of this certificate of incorporation.

The foregoing shall be construed both as objects and powers and the enumeration thereof shall not be held to limit or restrict in any manner the general powers conferred on this corporation by the laws of the State of Delaware.

FOURTH. This corporation is organized wholly for charity and is not organized for profit and is not to have authority to issue capital stock. The conditions of membership are as follows:

The four incorporators shall be members upon payment of One Dollar ($1.00) each to this corporation and upon agreement to give their services as required for five (5) years without compensation. No other person shall become a member except upon the unanimous approval of all members in attendance at the meeting passing upon the application.

Further conditions of membership, the determination of dues and other regulations governing the association, its members and officers shall be fixed in the by-laws of this corporation.

FIFTH. No part of its net income shall inure to the benefit of any member, officer, trustee or employee of the corporation, or of any individual having a personal or private interest in its activities, nor shall any such member, officer, trustee, employee or individual receive or be lawfully entitled to receive any pecuniary profit from its operation, except reasonable compensation for services

rendered in carrying out, or as a proper beneficiary of one or more of its said purposes.

\* \* \* \* \* \* \*

SEVENTH. This corporation is to have perpetual existence.

\* \* \* \* \* \* \*

NINTH. The property and business of the corporation shall be managed and controlled by its board of officers, and in furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the board of officers is expressly authorized:

To make, alter, amend and repeal the by-laws.

This corporation may in its by-laws confer powers in addition to the powers the authorities expressly confer upon them by law.

\* \* \* \* \* \* \*

ELEVENTH. This corporation reserves the right to amend, alter, change or repeal any provision contained in this certificate of incorporation in the manner now or hereafter prescribed by law and all rights conferred on officers and members herein are granted subject to this reservation.

Petitioner never issued capital stock; it never carried on propaganda to influence legislation; it never participated or intervened in any political campaign on behalf of any candidate for office; and it neither paid salaries to its officers or members nor reimbursed them for expenses.

The name, office in petitioner, and relationship to Edwin Fenton Stevens (hereinafter sometimes referred to as Stevens) of each of the persons ever admitted to membership in petitioner are as follows:

| Name | Office in petitioner | Relationship to Edwin Fenton Stevens |
|---|---|---|
| Edwin Fenton Stevens [1] | President | Self. |
| Sadie Augusta Stevens [1] | Secretary-treasurer | Wife. |
| Charles Ray Stevens [1] | General manager | Brother. |
| Henry Oldaker Stevens [1] (deceased Apr. 27, 1955). | Vice president | Brother. |
| Blanche W. Stevens | Assistant to secretary-treasurer | Sister. |
| Olive G. Stevens (deceased May 7, 1954). | Assistant to vice president | Sister-in-law (wife of C. R. Stevens). |
| Mary E. Stevens Wissing | Second assistant to vice president. | Niece. |
| Helen F. Stevens Chase | Second assistant to general manager. | Niece. |
| Henry Orrin Stevens | Assistant to president | Nephew. |
| Bess M. Stevens | Assistant to general manager | Sister-in-law (wife of Henry Oldaker Stevens). |

[1] Incorporators of petitioner.

Petitioner applied in 1943 for exemption from Federal income taxes. By letter dated January 12, 1944, respondent notified petitioner that:

Notwithstanding the provisions contained in your articles of incorporation that the objects and purposes specified shall be regarded as independent objects and purposes, it appears that in view of paragraph Fifth all of the income realized from the exercise of the powers conferred upon you must be used for charitable purposes. In reply to item 12 of questionnaire, Form 1023, you have stated

that you are not and have not been engaged in carrying on propaganda or otherwise attempting to influence legislation.

It is the opinion of this office that if you are operated exclusively in furtherance of your stated purposes, you will be entitled to exemption from Federal income tax under the provisions of section 101(6) of the Internal Revenue Code as an organization organized and operated exclusively for charitable purposes and will not be required to file returns of income.

By letter dated May 1, 1947, respondent notified petitioner that:

It is the opinion of this office, based upon the evidence presented, that you are exempt from Federal income tax under the provisions of section 101(6) of the Internal Revenue Code and corresponding provisions of prior revenue acts, as it is shown that you are organized and operated exclusively for charitable purposes.

Accordingly, you will not be required to file income tax returns unless you change the character of your organization, the purposes for which you were organized, or your method of operation. Any such changes should be reported immediately to the collector of internal revenue for your district in order that their effect upon your exempt status may be determined.

In 1906 the four persons who later incorporated petitioner organized a partnership known as Stevens Bros. Contractors (hereinafter sometimes referred to as Partnership). All four shared equally in Partnership's profits during the years before the Court until the death of Henry Oldaker Stevens. Thereafter, the remaining three partners shared equally in Partnership's profits during the years before the Court.

Petitioner's books of account and records are kept in ledgers separate from the individual ledgers in which the records of Partnership and Corporation are kept.

During the period April 1, 1947, to May 14, 1954, petitioner's cash was kept in a joint bank account maintained by it, Partnership, and Stevens Bros. Coal Co. The endorsement stamp used read as follows:

PAY FIRST NATIONAL BANK
1845 St. Paul Minn. or order 1845
Stevens Bros. Coal Co.
Stevens Bros. Contractors
Stevens Bros. Foundation, Inc.
STEVENS BROS.

A separate bank account for petitioner was established after 1954 in the First National Bank of St. Paul.

Cash receipts, deposits, and disbursements records for each of the joint bank depositors were maintained by separate columnar distributions in a joint cash receipts book and disbursements books for each item of receipt, deposit, and disbursement to each joint depositor.

Corporation was chartered in Delaware in 1929, at which time it was owned in equal shares by Partnership and members of the Miller-Hutchinson Company. During the years before the Court, 1,500

shares in Corporation were owned by R. C. Hutchinson (hereinafter sometimes referred to as Hutchinson) and the remaining 3,000 shares outstanding were owned by Partnership. Hutchinson was secretary-treasurer of Corporation and Stevens was its president during all the years before the Court.

During the years before the Court, Corporation was engaged in the construction business.

In 1947 Hutchinson, who was then in active charge of Corporation and its operations, traveled to St. Paul, Minnesota, to request permission from Stevens for Corporation to bid on a contract to build the floor at the Algiers Locks, about 5 miles below New Orleans, Louisiana. Hutchinson requested such permission because the government required a bid bond and the surety company informed him it would not issue a bond on Corporation's bid unless an additional $50,000 in cash was absolutely subordinated to the contract. The bank with which Corporation normally did its business refused to lend this additional sum because Corporation's line of credit was used up.

Stevens suggested that petitioner probably had the necessary funds and might advance them. Hutchinson then spoke before petitioner's board of directors, which, at its meeting of May 29, 1947, agreed to advance the money in return for one-third of the profits before taxes, plus repayment of the advance. Petitioner was to have no authority with regard to the actual construction work.

Hutchinson then notified petitioner that the surety company had changed its mind and insisted on having $75,000 subordinated to the contract instead of the $50,000 previously required. He offered petitioner one-half the profits before taxes, plus repayment of petitioner's advance. This new agreement was accepted by petitioner's board of directors at its July 1, 1947, meeting and the earlier agreement was canceled. The bid Hutchinson submitted was accepted and petitioner advanced the $75,000 as per its agreement.

The next year petitioner advanced an additional $40,000 to pay for steel sheet piling which had to be secured before other work could be done. Petitioner received no additional consideration for the $40,000 advance. This advance was ultimately returned.

Before the Algiers Lock floor contract was completed, the contract for the erection of the walls at the same lock was opened for bidding. Corporation bid on that contract, received the award, and unsuccessfully attempted to secure a bond for the contract bid without being required to furnish additional funds. Once again, Corporation's bank would not advance any further funds.

The agreement between petitioner and Corporation covering the Algiers Lock floor was extended for the Algiers Lock wall contract and the $75,000 previously advanced by petitioner was left with Corpora-

tion pursuant to the extended agreement. No additional money was furnished by petitioner for use on the Algiers Lock wall contract.

Petitioner reported income from profits in the Algiers Lock investments in the amount of $128,410.60 on its Form 990 for its taxable year 1950, and $24,198.71 for its taxable year 1951. On its partnership returns with Corporation, petitioner reported its share of the Algiers Lock profits as $87,203.91 for calendar 1949 and $31,153.01 for calendar 1950.

Before the Algiers Lock wall contract was completed, Corporation was invited by T. L. James & Co., Inc. (hereinafter sometimes referred to as James), a contracting firm, to bid with James on the Cheatham Lock contract—a job for the lock on the Cumberland River near Ashland City, Tennessee. The lock was to be a thousand feet long and the job amounted to about $5 million. The invitation was accepted and Corporation and James, jointly, were awarded the contract.

Petitioner agreed to extend the financial terms of the agreement for the Algiers Lock project (including the $75,000 investment) to the Cheatham Lock project. Subsequently, petitioner advanced the additional sums of $25,000 (August 20, 1951) and $50,000 (October 4, 1951) for use on the Cheatham Lock project.

Profits from the Cheatham Lock project were to be divided equally between James and Corporation. Half of Corporation's profits were to go to petitioner. On its corporation return for its taxable year 1955 and its partnership return with Corporation for calendar 1954, petitioner reported as its share of the Cheatham Lock profit (completed contract method) a capital gain of $48,306.44 and an ordinary loss of $22,528.20.

$19,081.95 of the capital gain was attributable to sales of equipment used on the project which had been divided between the joint contractors (Corporation and James) and subsequently sold.

The remaining $29,224.49 of the capital gain was attributable to the sale of steel sheet piling which consists of sheets of steel having interlocks on each edge whereby each successive sheet fastens onto the preceding sheet. About 3,000 tons of steel sheet piling was used in the Cheatham Lock for a temporary cofferdam. The cofferdam was for the protection of the contractors and if withdrawn before the proper time would have caused the contractors loss. The contractors transferred ownership of the steel sheet piling to the Corps of Engineers for the time that it was required on the lock. After the piling had served its purpose, it was pulled out of the job, trimmed, cut, and sold by the joint venturers.

Stevens had been engaged as an engineering contractor in the construction of railroads, highways, bridges, paving, airports, and locks from 1906 to the period here involved—contracts involving many millions of dollars. Based on his experience and on knowledge of the Al-

giers and Cheatham Lock projects, he felt that there was no substantial risk to petitioner's investments in those contracts. He would not have invested petitioner's funds in the projects if he believed there were such risks.

The lock construction project relationship between petitioner and Corporation terminated in 1954. The $75,000 original investment and the $75,000 additional investment in the Cheatham Lock project in 1951 were returned about 1953. Petitioner received its distributive share of the Cheatham Lock project profits in 1955.

Petitioner was adequately compensated for its involvement in the Algiers and Cheatham Lock projects. No part of what should have been petitioner's profits was diverted to its members through Corporation or partnership. Petitioner's advances of money for use on the canal lock projects were not loans but rather constituted petitioner's contributions to a joint venture with Corporation.

One of the substantial purposes for petitioner's involvement in the lock construction projects was to benefit petitioner's founders, through their interest in and indirect control over petitioner's co-venturer, Corporation.

For each of its taxable years 1948, 1952 through 1954, and 1956 through 1958, 80 percent or more of petitioner's gross income was of the kind included in the definition of personal holding company income under the applicable Internal Revenue laws. For its taxable year 1955 less than 80 percent of petitioner's gross income was personal holding company income.

On March 31, 1947, petitioner acquired stock in Denver & Rio Grande Railway at a cost of $4,971.50. On November 5, 1947, petitioner acquired stock in St. Louis & San Francisco Railway at a cost of $4,877.90. Petitioner deducted these amounts on its information return for its taxable year 1949, claiming worthlessness. Stevens tried unsuccessfully to sell those securities in 1949. He believed they had no value in 1949 and none at the time of trial. On its information return for its taxable year 1952 petitioner included a gain from the sale of "Denver and Rio Grande 5s of 55 bonds" for $10,272.60 on June 5 and 15, 1951. The return indicates the bonds were purchased on December 8, 1947, for $4,166.80.

Partnership loaned certain sums of money to petitioner during the period beginning in February 1946 and ending in October 1953. The total outstanding on the first day of any month during that period ranged from $496,973.71 to $969,211.62 and averaged $783,266.59 for that period.

Petitioner paid no interest on those loans outstanding during its taxable years 1946 through 1948. Partnership charged no interest because its members had established petitioner and were interested in seeing it secure funds with which to operate.

Petitioner paid interest to Partnership amounting to $19,200 during each of its taxable years 1949, 1951, 1952, and 1953, and $9,600 during its taxable year 1954. These amounts were "rounded off" without regard to the varying amounts of the loans.

Petitioner paid interest on those loans in the amount of $24,508.33 during its taxable year 1950, amounting to the "established rate" of $19,200 plus an excess of $5,308.33, which arose out of efforts undertaken by petitioner's officers to see whether it could borrow funds from other parties. This $5,308.33 charge was for funds borrowed in connection with such efforts. Partnership's members (who are also the officers of petitioner) determined this excess amount was charged to petitioner in error and that they would repay the amount to petitioner, but they had not yet repaid as of the date of the trial.

Partnership charged interest for those fiscal years because its members believed petitioner had reached the point where it could afford to pay interest.

Since 1954 petitioner has not borrowed funds from Partnership or from any other source and has not paid any interest to Partnership.

A patent issued in Stevens' name was secured for petitioner for a heating device at a cost to petitioner of $180. It was secured so petitioner could license its use and also distribute the device for therapeutic purposes.

Experimental designs were developed and experimental heaters were constructed by Partnership. The material costs incurred by Partnership were treated as a gift by it to petitioner and half the heaters manufactured were turned over free of cost to petitioner for its purposes. Petitioner distributed its heaters to hospitals, old folks' homes, and individuals (including at least seven relatives and business and social acquaintances of Stevens) for therapeutic and experimental purposes. About 100 heaters were distributed.

An arbitrary value was assigned to the experimental heaters and the value so assigned was reflected in petitioner's books as the amount in dollars included among the contributions, gifts, and grants made by it. Although most of the heaters were donated in this manner, some were sold. The aggregate value of the contributions, gifts, and grants of the experimental heaters as reflected in the book of the Foundation consisted of $2,300 during the period ending before April 1, 1947, and $2,210.25 after that date.

It was concluded that the patent had little value since only 2 of the 22 uses sought in the patent application were granted.

Petitioner began making educational loans to college students about 1952. The students selected to receive aid were senior students, most

of whom attended Minnesota colleges. The students signed notes in order to obtain these loans. However, repayment was waived in the case of most or all of the 32 loans, totaling $4,605, made during petitioner's taxable years 1953 through 1955. The first of these loans was forgiven on December 20, 1952, although the student was not notified until a year or more later.

For its taxable years 1956 through 1958 petitioner made 36 loans, totaling $7,496. Loan terms are extended without question whenever a student advances a good reason for delay in payment. No student has defaulted or failed to repay any of the loans made during petitioner's taxable years 1956 through 1958.

Petitioner's books indicate receipts, disbursements, and student loans in the following amounts:

| Fiscal year through— | Contributions received | Other income | Expenses | Contributions, gifts, grants, etc. | Student loans | Surplus balance |
|---|---|---|---|---|---|---|
| 1947 | $36,038.75 | $69,573.00 | $139.87 | $4,227.50 | | $101,244.38 |
| 1948 | 58.00 | 87,752.98 | 27.00 | 1,245.25 | | 187,783.11 |
| 1949 | | 35,024.83 | 19,315.75 | 235.00 | | 203,257.19 |
| 1950 | 1,200.00 | 180,271.85 | 24,715.33 | 1,825.00 | | 358,188.71 |
| 1951 | | 94,967.41 | 19,237.00 | 1,000.00 | | 432,919.12 |
| 1952 | | 73,782.91 | 19,230.00 | 1,250.00 | | 486,222.03 |
| 1953 | 105.00 | 38,212.89 | 19,295.00 | [1] 2,090.00 | | 503,154.92 |
| 1954 | | 19,741.79 | 9,630.00 | [1] 3,931.64 | | 509,335.07 |
| 1955 | 1.00 | 20,679.41 | 1,450.00 | [1] 2,015.00 | | 526,550.48 |
| 1956 | 1.00 | 14,330.00 | 1,392.20 | 2,150.00 | $770 | 537,339.28 |
| 1957 | | 24,278.26 | 3,571.00 | 1,600.00 | 1,725 | 556,446.54 |
| 1958 | 23,879.70 | 25,134.82 | 2,050.55 | 1,725.00 | 5,001 | 601,685.51 |

[1] Of these sums, the following amounts were student loans that were forgiven: 1953—$2,090; 1954—$1,500; 1955—$1,015.

Petitioner's members planned to accumulate in petitioner $1 million, from which they calculated petitioner could be expected to derive an annual income of $50,000. They expected this to be sufficient to meet petitioner's expenses and have a significant sum available for charitable purposes. This plan was determined on or before August 20, 1953.

At the time of the trial herein, petitioner's investments had a total value of $950,000.

On information returns for each of its taxable years 1948 through 1954 petitioner answered "no" to the following question:

Have you had any sources of income or engaged in any activities which have not previously been reported to the Bureau? If so, attach detailed statement. _____ (Yes or no)

Except for the matters noted immediately below and the partnership returns referred to at the outset of these findings of fact, petitioner had not previously informed respondent of its participation in the canal lock construction projects.

Petitioner's information returns for its taxable years 1950 and 1951 listed income from "Algiers Lock Investment" as "other income," a category that had not been used by petitioner in its information returns for the four immediately preceding taxable years.

Petitioner's information return for its taxable year 1952 listed in a balance sheet the item "Algiers Lock Investment." Balance sheets did not accompany petitioner's information returns for the 6 immediately preceding years.

Petitioner's information returns for its taxable years 1953 and 1954 listed in balance sheets the item "Cheatham Lock Investment."

By letter dated August 24, 1954, respondent notified petitioner that:

On the basis of the information before us it cannot be said that you have been organized and operated exclusively for one or more of the purposes stated in section 101(6) of the Code. You have expended only a nominal amount of your income for the charitable purposes on which your tax-exempt status was based. Instead your operations have consisted primarily of trading in securities with funds borrowed from your founders and you have either used the income earned for loans to them in their business ventures or have credited it to surplus.

Though the Service is not unmindful of the necessity, from the standpoint of charitable organizations, of acquiring income-producing investments, it is not believed that the funds of an exempt organization should be used indefinitely in the manner set forth above, particularly when the use thereof directly or indirectly benefits its founders.

Accordingly, our ruling of May 1, 1947, is hereby revoked. You are required, therefore, to file income tax returns on Form 1120.

The District Director of Internal Revenue at St. Paul, Minnesota, is being furnished a copy of this ruling.

By letter dated September 8, 1954, the district director at St. Paul notified petitioner that:

Inasmuch as the National Office, Washington, D.C. under date of August 24, 1954, revoked its ruling of May 1, 1947 granting your foundation exemption under Section 101(6) of the Internal Revenue Code, your organization is now liable for Federal corporation income tax returns.

There are enclosed for your use Forms 1120 for the years 1948 to 1953, inclusive.

Prior to August 24, 1954, Stevens had not been advised by respondent either that petitioner's returns were not filed on time or that it was engaged in activities not proper for a tax-exempt organization.

After receiving the revocation notice, Stevens made unsuccessful efforts to secure an explanation for the revocation satisfactory to him. Stevens then consulted an attorney, but still could not determine the cause for revocation. Stevens asked the attorney for an opinion as to petitioner's tax-exempt status. After receiving the opinion Stevens was not able to determine whether any of petitioner's activities conflicted with its claimed tax-exempt status.

As of the time of the trial, no corporate tax returns had been filed by petitioner for its taxable years 1948 through 1954.

OPINION.

## Issue 1. Statute of Limitations.

By timely amendment to its petition, petitioner claims that the statute of limitations [2] bars assessments of deficiencies for its taxable years 1948 through 1954. As to its taxable years 1948 through 1951, petitioner relies also upon section 302(b) of the Revenue Act of 1950.[3]

Respondent relies upon section 276(a) of the 1939 Code [4] and argues that the information returns filed by petitioner are not such returns as will start the running of the statute of limitations. Respondent maintains petitioner is to be denied exemption for a variety of reasons other than and in addition to the reason that it was carrying on a trade or business for profit. Respondent maintains that under these circumstances section 302(b) of the Revenue Act of 1950 is, by its terms, of no assistance to petitioner.

We agree with respondent.

Petitioner filed timely information returns for the first 4 years before us and it is not disputed that these were the returns required by section 54(f) of the 1939 Code. The deficiency notice was mailed to petitioner on June 14, 1960, more than 9 years after the last of the information returns for the 4 earliest years was received by respondent. However, our decision, *infra*, that petitioner was not exempt from income taxation during those 4 years for reasons other than that it engaged in a trade or business for profit, eliminates petitioner from the protection of section 302(b) of the Revenue Act of 1950.

Petitioner's other argument is also of no avail since the information returns filed by petitioner for its taxable years 1948 through 1954 in compliance with section 54(f) of the 1939 Code lack data necessary for the computation and assessment of deficiencies and therefore do not constitute "returns" for the purposes of section 275(a) of the 1939

---

[2] SEC. 275. [1939 Code] PERIOD OF LIMITATION UPON ASSESSMENT AND COLLECTION.

Except as provided in section 276—

(a) GENERAL RULE.—The amount of income taxes imposed by this chapter shall be assessed within three years after the return was filed, and no proceeding in court without assessment for the collection of such taxes shall be begun after the expiration of such period.

[3] SEC. 302. EXEMPTION OF CERTAIN ORGANIZATIONS FOR PAST YEARS.

(b) PERIOD OF LIMITATIONS.—In the case of an organization which would otherwise be exempt under section 101 of the Internal Revenue Code were it not carrying on a trade or business for profit, the filing of the information return required by section 54(f) of the Internal Revenue Code (relating to returns by tax-exempt organizations) for any taxable year beginning prior to January 1, 1951, shall be deemed to be the filing of a return for the purposes of section 275 of the Internal Revenue Code (relating to period of limitation upon assessment and collection). * * *

[4] SEC. 276. SAME—EXCEPTIONS.

(a) FALSE RETURN OR NO RETURN.—In the case of a false or fraudulent return with intent to evade tax or of a failure to file a return the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time.

Code. *Automobile Club* v. *Commissioner*, 353 U.S. 180, 187–188 (1957).

On this issue we hold for respondent.

### Issue 2. Retroactive Revocation.

Respondent suggests this Court is without power to review retroactive revocations of rulings under section 7805(b)[5] of the 1954 Code.[6] Respondent argues that even if this Court may review his actions, it can do so only where he has abused the discretion granted by the statute. He maintains that there has been no abuse here "since petitioner concealed certain facts and made misrepresentations to the respondent." Petitioner replies there is no doubt of this Court's power to review respondent's action. Petitioner maintains that it reported all its income from construction contracts when received according to the method by which it kept its books. Petitioner did not note on its returns that it engaged in business because it did not and does not now believe that it did engage in business.

We agree that respondent did not err in retroactively revoking petitioner's certificate of exemption.

Whatever the nature of the limitations imposed on respondent when he issues a ruling or otherwise acts with regard to a particular taxpayer, it is clear that those limitations apply only to situations of which respondent has been made aware. Respondent is not barred from changing his rulings retroactively where he was not fully or correctly informed as to the material facts upon which the rulings were based or where there have been material changes in law or fact subsequent to the time respondent acted. *Birmingham Business College, Inc.* v. *Commissioner*, 276 F. 2d 476 (C.A. 5, 1960), affirming a Memorandum Opinion of this Court; *Southern Maryland Agricultural Fair Association*, 40 B.T.A. 549 (1939); *United States* v. *La Societe Francaise de Bien, Mut.*, 152 F. 2d 243, 246 (C.A. 9, 1946). See *Automobile Club* v. *Commissioner, supra; Massaglia* v. *Commissioner*, 286 F. 2d 258 (C.A. 10, 1961), affirming 33 T.C. 379 (1959).

The facts which cause us to determine, *infra*, that petitioner was not exempt during the years before the Court all occurred after respondent issued his letter ruling which granted exemption. None of those facts was described to respondent before he issued that ruling. Since respondent was not adequately informed of the changes in petitioner's activities and purposes we cannot impute any significance

---

[5] SEC. 7805. RULES AND REGULATIONS.

(b) RETROACTIVITY OF REGULATIONS OR RULINGS.—The Secretary or his delegate may prescribe the extent, if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect.

[6] Since the certificate was revoked on August 24, 1954, after enactment of the 1954 Code (Aug. 16, 1954), the 1954 Code provision applies. Sec. 7831(a)(6)(C)(viii), 1954 Code. In any event, section 3791(b) of the 1939 Code is substantially the same.

here to the fact that respondent did not revoke his ruling until 1954. See *Automobile Club* v. *Commissioner, supra* at 186.

Petitioner notes that in *Birmingham Business College, Inc., supra,* the Court of Appeals sustained respondent's right to revoke when the original certificate was based on material misrepresentation. Petitioner argues that the disagreement over whether repayment of petitioner's first educational loan was forgiven in 1952 or in 1954 does not involve a material misrepresentation. Petitioner is correct in that the date of forgiveness of the loan is not material to our decision in this case. However, petitioner's entry into the joint ventures with Corporation and the provisions of the Revenue Act of 1950 regarding improper accumulations were material events occurring after the issuance of petitioner's exemption certificate. See Issue 3, *infra.* Since the ruling here relied upon (set forth in the Findings of Fact, *supra*) did not purport to cover changed conditions, it is immaterial whether the changes involved misrepresentations. Accordingly, the only relevance of *Birmingham Business College, Inc.* is to emphasize that respondent may retroactively revoke his rulings where the facts differ in some material respect from the information on the basis of which respondent issued his rulings.

Petitioner maintains that respondent discriminates between taxpayers similarly situated. Petitioner states on brief that in *Leon A. Beeghly Fund,* 35 T.C. 490 (1960), on appeal by the Government (C.A. 6, June 9, 1961), "the Commissioner revoked an exemption letter, not back to the issuance of the exemption letter, but from and after a date when the petitioner had entered into a certain transaction. In disposing of deficiencies asserted after that revocation the Court decided that the petitioner was not exempt, not for the years 1945 and subsequent years referred to in the notice of revocation, but for the year 1949 when the taxpayer executed the last step in a series of transactions that began with the year 1945." In *Beeghly,* as here, the certificate was revoked retroactively to the year in which the activities changed. It happens that in this case the material change in petitioner's activities occurred in the same taxable year that petitioner received its exemption certificate, while in *Beeghly* it occurred some years after that taxpayer received its certificate.[7] Since this Court's jurisdiction in *Beeghly* was based upon a deficiency notice for the year 1949 only, we could not make a binding determination in that case as to exemption for any year other than 1949. We are not privy to the Commissioner's thoughts in *Beeghly* in issuing a deficiency notice for 1949 only, but we note that much of that taxpayer's income was held by various courts until released to it in 1949. We cannot

---

[7] On or about June 23, 1948, respondent revoked the taxpayer's exemption certificate retroactive to December 28, 1945, the date on which the taxpayer had entered into the transactions which caused it to lose its exempt status. See Issue 3, *infra.* The exemption certificate had been issued August 12, 1941. 35 T.C. at 495.

determine whether the taxpayer in that case should have paid taxes for any year prior to 1949. Since we are not persuaded that respondent has discriminated between petitioner and *Beeghly*, we need not consider what if any effect such alleged discrimination, if proven, would have on this proceeding. Cf. *City Loan and Savings Company* v. *United States*, 177 F. Supp. 843, 851 (N.D. Ohio 1959), affd. 287 F. 2d 612 (C.A. 6, 1961).

Petitioner notes that section 302(b) of the Senate version of the Revenue Bill of 1950 (Amendment No. 157, p. 190, of Senate Print H.R. 8920) prohibited, as to years prior to 1951, retroactive revocation of exemption certificates. As petitioner also notes, that restriction was not enacted. Conf. Rept., H. Rept. No. 3124, pp. 14, 35 (Sept. 21, 1950), 1950-2 C.B. 590. However, even had that restriction been enacted it would not have helped petitioner, since it was limited by its terms to revocation of an organization's exempt status "on the ground that it is carrying on a trade or business for profit." The Senate report (No. 2375, p. 118 (Aug. 22, 1950), 1950-2 C.B. 567) states in this regard that "section 302 applies only where a denial of exemption might be made on the ground that the organization was carrying on a trade or business for profit, and nothing therein limits the denial of exemption for failure to meet other requirements of section 101."

Petitioner relies upon the opinion of the Court of Appeals for the Third Circuit in *Lesavoy Foundation* v. *Commissioner*, 238 F. 2d 589 (C.A. 3, 1956), reversing 25 T.C. 924 (1956), regarding when the Commissioner may be said to have abused his discretion. In that case the Court of Appeals was strongly influenced by its view that "The Commissioner's theory is a debatable one at best" (238 F. 2d at 593) ; the fact that the taxpayer fully disclosed its purchase of a cotton mill and provided information from which it might have been concluded that it did business with its donors (*id.* at 592) ; and the fact that the deficiency and additions would have exceeded the taxpayer's total assets. *Id.* at 594. See *Wolinsky* v. *United States*, 271 F. 2d 865, 868 (C.A. 2, 1959). These circumstances lead us to conclude that the Court of Appeals decision in *Lesavoy* is distinguishable from the instant case and does not require us to estop respondent from asserting deficiencies which we here hold are, in part, properly asserted.

Since we determined that the circumstances of this case do not warrant estopping respondent from retroactively revoking the certificate, we need not decide whether we have jurisdiction to determine that respondent may be estopped from doing so. See *Lorain Avenue Clinic*, 31 T.C. 141, 165 (1958).

On this issue we hold for respondent.

## *Issue 3. Exemption.*

Respondent advances a number of arguments to support his contention that petitioner is not exempt from taxation. At this point we will consider only two: (1) Petitioner was not operated exclusively for tax-exempt purposes since its involvement in the Algiers and Cheatham Lock projects resulted in substantial commercial benefits to its members and (2) the sums petitioner accumulated out of income and did not actually pay out during the taxable years before the Court were unreasonable in amount and duration in order to carry out its charitable purposes.

Petitioner claims to be exempt from taxation under the provisions of sections 501(c)(3) of the 1954 Code[8] and 101(6) of the 1939 Code.[9] It stresses the bona fide nature of its involvement in the construction contracts and the reasonableness of accumulating $1 million in order to achieve a sufficiently high level of earnings to accomplish its charitable purposes.

We agree with respondent that petitioner was not operated exclusively for tax-exempt purposes during its taxable years 1948 through 1955 and that it unreasonably accumulated income during its taxable years 1952 through 1958.

### Operated Exclusively for Tax-Exempt Purposes.

In order to be exempt from taxation under the provisions set forth in the margin, petitioner must satisfy each of the requirements of (1) operation and organization exclusively[10] for the listed exempt pur-

---

[8] SEC. 501. EXEMPTION FROM TAX ON CORPORATIONS, CERTAIN TRUSTS, ETC.

(a) EXEMPTION FROM TAXATION.—An organization described in subsection (c) or (d) or section 401(a) shall be exempt from taxation under this subtitle unless such exemption is denied under section 502, 503, or 504.

\* \* \* \* \* \* \*

(c) LIST OF EXEMPT ORGANIZATIONS.—The following organizations are referred to in subsection (a):

\* \* \* \* \* \* \*

(3) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, \* \* \* or educational purposes, \* \* \* no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office.

[9] SEC. 101. EXEMPTIONS FROM TAX ON CORPORATIONS.

The following organizations shall be exempt from taxation under this chapter—

\* \* \* \* \* \* \*

(6) Corporations, and any \* \* \* foundation, organized and operated exclusively for religious, charitable, \* \* \* or educational purposes, \* \* \* no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation;

Section 332(c) of the Revenue Act of 1950 amended this provision by replacing the final semicolon with a period and adding the following after the period:

For loss of exemption under certain circumstances, see sections 3813 and 3814;

[10] "Exclusively," in this context, means that there is no non-exempt purpose that is "substantial in nature." *Better Business Bureau* v. *United States,* 326 U.S. 279, 283 (1945).

poses, (2) no inurement of net earnings to the benefit of individuals or stockholders, and (3) no political activity or substantial lobbying activity.[11] Since the requirements are in the conjunctive, failure to satisfy any one of them causes a loss of tax exemption.

In *Leon A. Beeghly Fund, supra,* the Fund, which already owned 151 shares of Cold Metal Process Co., purchased the remaining 1,849 shares of Cold Metal, liquidated it, sold the stock of a subsidiary of Cold Metal, sold various other assets, and succeeded to the litigation of Cold Metal, from all of which it obtained a substantial profit. The other shareholders of Cold Metal, who had been negotiating with a view toward selling their stock to certain steel companies, had encountered difficulties, among them the insistence of the prospective purchasers that the transaction be completed before expiration of the World War II excess profits tax and the reluctance of those purchasers to acquire the subsidiary. Our conclusion (*id.* at 519) was unanimous on this issue:

it is clear that the trust was brought into this transaction for the primary purpose of permitting the stockholders of Cold Metal to settle with the steel companies for the amount agreed upon in such a manner that they would have something left after taxes, and we think that in entering into the transaction for that purpose the trust was being operated other than exclusively for charitable purposes within the intent of the statute, and that when it continued to be used in the year 1949 in carrying out this transaction, it was also being operated for other than exclusively charitable purposes.

Petitioner's involvement in the Algiers Lock floor project met Corporation's pressing need for cash. Petitioner was not approached until Corporation had been turned down by both its bank and the bonding company. Petitioner's founders controlled Corporation through Partnership. Petitioner could not benefit from the transaction unless Corporation, and therefore petitioner's founders, also benefited. These facts lead us to conclude that petitioner's involvement in the project was to a substantial extent an effort to benefit its founders. Petitioner's involvement in the Algiers Lock wall contract and the Cheatham Lock contract were, in purpose and effort, continuations of involvement in the Algiers Lock floor contract. On the basis of *Beeghly* we hold that for the years during which petitioner was involved in the Algiers and Cheatham Lock projects it was not operated exclusively for tax-exempt purposes. See *Horace Heidt Foundation,* 145 Ct. Cl. 322, 170 F. Supp. 634 (1959).

We have found petitioner's involvement in the lock construction projects ended some time in 1954. We have not been able to determine when in 1954 this occurred. Petitioner has not persuaded us that this occurred before March 31, 1954, the end of its taxable year 1954, and we therefore hold that petitioner was not operated exclusively for tax-exempt purposes during its taxable years 1948 through 1955.

---

[11] Respondent does not contend petitioner has failed to meet the third test.

## Unreasonable Accumulations.

Section 3814 of the 1939 Code [12] was added by section 331 of the Revenue Act of 1950 and made applicable by section 333 of that Act to taxable years beginning after December 31, 1950. Section 504(a) of the 1954 Code is, for our purposes, substantially a reenactment of section 3814 of the 1939 Code.[13] Petitioner, if it is exempt from taxation, is exempt only under section 101(6) of the 1939 Code or section 501(c)(3) of the 1954 Code. Petitioner is not excepted by the provisions of section 3813(a) of the 1939 Code or 503(b) of the 1954 Code from the application of either sections 3813 or 503, respectively. Consequently, sections 3814 of the 1939 Code and 504(a) of the 1954 Code are at least initially applicable to petitioner.

Since it is clear that for each of the years before the Court to which sections 3814 and 504(a) are applicable (petitioner's taxable years 1952 through 1958) petitioner had substantial accumulations out of income for that year or prior years, the only issue is whether the accumulations were unreasonable in amount or duration in order to carry out petitioner's tax-exempt purposes.

For an understanding of what constitutes an unreasonable accumulation for purposes of these sections both parties rely upon *Samuel Friedland Foundation* v. *United States*, 144 F. Supp. 74, 92 (D.N.J. 1956), where the court stated:

What the true test appears to be is this,—Does the charitable organization have a concrete program for the accumulation of income which will be devoted to a charitable purpose and in the light of existing circumstances is the program a reasonable one?

In *Friedland*, the taxpayer had been in operation only 3 years. It had a specific objective—accumulation of $500,000 for a medical research building for Brandeis University. This objective was determined during its first year of operation. *Id.* at 80. The court estimated this goal was likely to be reached in 6 or 7 years from the creation of the foundation. *Id.* at 93. Although "excess" accumula-

---

[12] SEC. 3814. DENIAL OF EXEMPTION UNDER SECTION 101(6) IN THE CASE OF CERTAIN ORGANIZATIONS ACCUMULATING INCOME.

In the case of any organization described in section 101(6) to which section 3813 is applicable, if the amounts accumulated out of income during the taxable year or any prior taxable year and not actually paid out by the end of the taxable year—

(1) are unreasonable in amount or duration in order to carry out the charitable, educational, or other purpose or function constituting the basis for such organization's exemption under section 101(6) ; or

(2) are used to a substantial degree for purposes or functions other than those constituting the basis for such organization's exemption under section 101(6) ; or

(3) are invested in such a manner as to jeopardize the carrying out of the charitable, educational, or other purpose or function constituting the basis for such organization's exemption under section 101(6),

exemption under section 101(6) shall be denied for the taxable year.

[13] References in section 3814 of the 1939 Code to sections 101(6) and 3813 are replaced in section 504(a) of the 1954 Code by references to 501(c)(3) and 503, respectively. The exceptions embodied in the last two sentences of section 504(a) are not applicable to this case.

tions totaled only $39,000 for the organization's first 3 years, contributions by it totaled $50,000.  *Id.* at 91, 92.

Here petitioner has been in existence 15 years (as of the end of the last taxable year before the Court).  No functional objective appears from the record.  We are not told when the $1 million asset goal testified to by petitioner's president was determined.  In recent years petitioner has embarked on a student loan program but no substantial effort is made to relate the needs of that program to the $1 million goal.  Neither petitioner's charter, bylaws, nor the minutes of the meetings of its members or officers, nor any other part of the record indicates any particular use to which either the accumulated income or the then current income would be put.

If we adopt the approach of *Friedland* in determining the amount of "excess" accumulations—earned income (other than capital gains), less expenses and contributions—we arrive at excess accumulations for the years before the Court, *per petitioner's books*, as follows:

| Year | Earned income other than capital gains | Expenses | Contributions | "Excess" accumulations | |
|---|---|---|---|---|---|
| | | | | Year | Cumulative |
| 1948 | $34,762.23 | $27.00 | $1,245.25 | $33,489.98 | $33,489.98 |
| 1949 | 49,009.81 | 19,315.75 | 235.00 | 29,459.06 | 62,949.04 |
| 1950 | 180,271.85 | 24,715.33 | 1,325.00 | 153,731.52 | 216,680.56 |
| 1951 | 94,967.41 | 19,237.00 | 1,000.00 | 74,730.41 | 291,410.97 |
| 1952 | 67,677.11 | 19,230.00 | 1,250.00 | 47,197.11 | 338,608.08 |
| 1953 | 55,368.00 | 19,295.00 | 2,090.00 | 33,983.00 | 372,591.08 |
| 1954 | 40,052.09 | 9,630.00 | 3,931.64 | 26,490.45 | 399,081.53 |
| 1955 | 1 (2,765.62) | 1,450.00 | 2,015.00 | (6,230.62) | 392,850.91 |
| 1956 | 14,081.00 | 1,392.20 | 2,150.00 | 10,538.80 | 403,389.71 |
| 1957 | 24,278.26 | 3,571.00 | 1,600.00 | 19,107.26 | 422,496.97 |
| 1958 | 24,650.92 | 2,050.55 | 1,725.00 | 20,875.37 | 443,372.34 |

1 Treats construction contract income as ordinary loss and capital gain, per petitioner's corporate income tax return.

On every count petitioner's accumulations seem to be unreasonable as to time and amount.[14]

This Court had occasion to apply sections 3814 and 504 in *A. Shiffman,* 32 T.C. 1073 (1959).  There a foundation borrowed amounts totaling $1 million with which it purchased income-producing property during its first year of operation.  The notes were paid off in 5 years, during which time the foundation also distributed $235,071.95 to charitable organizations.  In addition, the foundation pledged itself to two long-term projects: $250,000 to Brandeis University for a building project and $500,000 to Sinai Hospital of Detroit. *Id.* at 1077.  This Court concluded: "Assuming, but not deciding, that the use of income, year by year, to pay an indebtedness incurred in acquiring in-

---

[14] This method, in which the facts have been viewed in the light most favorable to petitioner, shows a negative accumulation for petitioner's taxable year 1955.  However, the statute penalizes unreasonable accumulations out of income for the taxable year or any prior year if the amounts have not been paid out by the end of the taxable year.

come-producing property constitutes an accumulation of income, such accumulation here involved is neither unreasonable nor for substantially nonexempt purposes." *Id.* at 1081.

In *Erie Endowment* v. *United States*, 202 F. Supp. 580 (W.D. Pa. 1961), on appeal (C.A. 3), the court was faced with an inter vivos trust which provided, among other things, that certain percentages of each year's trust income would be added to corpus until the additions plus original corpus totaled $10 million.

The court held that the trust violated the unreasonable accumulations provision of section 504(a) of the 1954 Code, (*id.* at 582–583):

because there are no specific projects or objectives for which the income was accumulated. * * * The court is well acquainted with and has a great respect for the integrity and ability of [the trustees] * * *. The principle and main purpose of the trust in the first instance, however, must be held to be the accumulation of $10,000,000.00. When that goal is reached, then something worthwhile can be undertaken. As indicated, it is apparent that the purposes and objectives of the trust in the first instance were and continue to be laudable, but under the circumstances the substantial income cannot be held to be exempt from taxation. * * *

The recently decided case of *Hulman Foundation, Inc.* v. *United States*,—F. Supp.—(S.D. Ind. 1962), consistently with the cases cited above, held that the taxpayer was accumulating income largely in order to construct a civic building for Vigo County, Indiana, that this purpose was consistent with its tax-exempt status, and that the amounts accumulated were not unreasonable to carry out this specific exempt purpose.

Based on the statutory provisions hereinabove discussed, the reasoning and fact situations of the *Shiffman*, *Friedland*, *Erie Endowment*, and *Hulman* cases, and the facts disclosed by the record here, we conclude that during each of its taxable years 1952 through 1958 the amounts petitioner accumulated out of the income of that year and prior years and not actually paid out before the end of that year were unreasonable in amount and duration in order to carry out its tax-exempt purposes.

Petitioner cites to us *A. Shiffman*, *supra*; *Alan Levin Foundation*, 24 T.C. 15 (1955); *Ohio Furnace Co.*, 25 T.C. 179 (1955); and *John Danz Charitable Trust*, 32 T.C. 469 (1959), affd. 284 F. 2d 726 (C.A. 9, 1960), for the proposition that "the touchstone of exemption is not the amount of a fund or the period of accumulations, but whether that which is retained and not distributed serves the purpose for which the organization was formed."

In *Shiffman* the accumulation was to pay off an obligation incurred in acquiring the very property which produced the income being accumulated and we there expressed some doubt that that constituted the sort of accumulation contemplated by the statute. In any event,

the foundation there had specific, reasonable goals and also made substantial current contributions out of its income.

None of the remaining three cases cited by petitioner depended upon the unreasonable accumulation provisions here at issue. All the years involved in *Levin* and *Ohio Furnace* were prior to the effective date of section 3814 of the 1939 Code. Two of the years before this Court in *Danz* were subsequent to the effective date of section 3814. However, in that case neither in the pleadings nor on brief did the Commissioner argue that that provision was applicable. The comment in *Ohio Furnace*, quoted in *Shiffman*, 32 T.C. at 1079, that "Certainly there is no requirement that the income must either be used or distributed in the year realized for the described purpose, and we know of no case wherein a corporation, fund, or foundation was denied exempt status merely because it accumulated its income for distribution in a succeeding or later year" does not have relevance here in view of the existence and applicability of sections 3814 of the 1939 Code and 504(a) of the 1954 Code and the fact that the Commissioner here does raise the issue that those sections operate to deny exempt status to petitioner.

Petitioner advances the argument that after respondent revoked the exemption certificate prudence dictated that petitioner accumulate income with which to pay any taxes for which petitioner might reasonably be held liable. Petitioner notes that its accumulated surplus increased by only $92,350.44 during its last 4 taxable years before the Court, while respondent has asserted deficiencies and additions to tax totaling $104,076.95 for that same period. How can it be said, argues petitioner, that an accumulation of amounts less than the taxes sought by respondent is an unreasonable accumulation?

Since the record is barren of evidence that the accumulations were in fact made pursuant to a program to set aside funds to pay a possible tax liability, petitioner's argument amounts to this: We now have something we can do with our income, therefore it is reasonable for us to have accumulated it.

This argument would make the unreasonable accumulations provision completely ineffective for it would leave organizations free to accumulate income without having any purpose, secure in the knowledge that any challenge to its exempt status on account of its accumulations could always be met by a last-minute *ex post facto* decision on its part. There is no warrant for so emasculating the unreasonable accumulations provision. The statutory language seems opposed to it, the decision in *Erie Endowment* is cleary contra, and the opinions in *Shiffman, Friedland Foundation*, and *Hulman* do not require such a result.

We conclude that for each taxable year both current accumulations and accumulations out of the income of prior years must be supported

by a currently existing program justifying such accumulations. Afterthoughts will not suffice.

In view of our decision for the reasons above stated, it is not necessary to determine whether petitioner was organized exclusively for tax-exempt purposes; whether petitioner engaged in a trade or business to such an extent that it could not be said to be operated exclusively for tax-exempt purposes; whether petitioner's investments in the construction projects so jeopardized its funds as to constitute operation for a nonexempt purpose or an improper accumulation under sections 3814(3) of the 1939 Code and 504(a)(3) of the 1954 Code; and whether petitioner's "vague charitable design" caused it to fail the "organized and operated exclusively" test.

On the issue of exemption from Federal income taxation we find for respondent as to all the years before the Court.

### Issue 4.  Personal Holding Company.

Respondent determined that for each of petitioner's taxable years 1948 and 1952 through 1958 petitioner was a personal holding company within the meaning of sections 501(a) of the 1939 Code [15] and 542(a) of the 1954 Code.[16]  Petitioner concedes it had the required percentage of personal holding company income for each of those years except 1955.  During all the years petitioner had no more than 10 members, each with an equal voice in its affairs.  Petitioner concedes the family relationships between the members sufficient to bring the ownership attribution rules [17] into effect so that more than 50 percent of petitioner's memberships were "owned" by not more than five individuals during the latter half of each of the years before us on this issue.

---

[15] SEC. 501.  DEFINITION OF PERSONAL HOLDING COMPANY.

(a) GENERAL RULE.—For the purposes of this subchapter and chapter 1, the term "personal holding company" means any corporation if—

(1) GROSS INCOME REQUIREMENTS.—At least 80 per centum of its gross income for the taxable year is personal holding company income as defined in section 502; * * * and

(2) STOCK OWNERSHIP REQUIREMENT.—At any time during the last half of the taxable year more than 50 per centum in value of its outstanding stock is owned, directly or indirectly, by or for not more than five individuals.

[16] For our purposes section 542(a) of the 1954 Code is essentially a reenactment of section 501(a) of the 1939 Code.

[17] SEC. 503.  [1939 Code] STOCK OWNERSHIP.

(a) CONSTRUCTIVE OWNERSHIP.—For the purpose of determining whether a corporation is a personal holding company, insofar as such determination is based on stock ownership under section 501(a)(2), section 502(e), or section 502(f)—

* * * * * * *

(2) FAMILY AND PARTNERSHIP OWNERSHIP.—An individual shall be considered as owning the stock owned, directly or indirectly, by or for his family or by or for his partner.  For the purposes of this paragraph the family of an individual includes only his brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants.

Section 544(a)(2) of the 1954 Code is, for our purposes, essentially a reenactment of section 503(a)(2) of the 1939 Code.

Petitioner's first argument is that it is an exempt organization, thereby excepted from the definition of personal holding company. Sec. 542(c) (1), 1954 Code; sec. 501(b) (1), 1939 Code. We have decided this issue adversely to petitioner. See Issue 3, *supra*.

Petitioner's second argument is that since its charter forbids the issuance of stock and no stock in fact was issued or outstanding during any of the years before the Court, the 50-percent stockholding requirement (secs. 501(a) (2), 1939 Code, and 542(a) (2), 1954 Code) is not satisfied. Petitioner cites Rev. Rul. 58-556, 1958-2 C.B. 355, in which the Commissioner determined that memberships in an Indiana nonstock, nonprofit foundation which had lost its tax exemption would not be treated as stockholdings for personal holding company tax purposes.

Respondent relies on petitioner's reserved power to amend its charter, alleges a right of petitioner's members to share in its property on dissolution, and suggests the general equivalence of stockholders in stock corporations with members in nonstock corporations. Respondent distinguishes the cited revenue ruling on the ground that the applicable Indiana law (General Not For Profit Corporation Act) forbids the transfer of earnings from the corporation to its members and provides for escheat to the State of surplus assets on liquidation. Respondent argues that, since the applicable Delaware law does not similarly restrict petitioner's actions, petitioner's members have beneficial interests equivalent to stockholdings for personal holding company tax purposes.

Petitioner replies its charter was not amended and denies that the general equivalence of stockholders in stock corporations with members in nonstock corporations applies in all circumstances or all jurisdictions; and further, that on dissolution, application of the *cy pres* doctrine will keep petitioner's property devoted to charitable uses. Finally, petitioner argues, its reserved power to amend its charter does not permit an amendment which will change the basic purposes of the corporation and any amendment to give it the power to distribute profits or liquidate for its members' benefit would be such a prohibited amendment.

We agree with petitioner that for its taxable year 1948 its memberships do not correspond to stockholdings for personal holding company tax purposes. As to the other years before us on this issue, we agree with respondent that the stock ownership requirement has been satisfied

Both the 1939 (sec. 3797(a) (7)) and the 1954 (sec. 7701(a) (7)) Codes define "stock" to include "shares in an association, joint-stock company, or insurance company." Neither party refers to that definition and the definition is not helpful in determining whether peti-

tioner's memberships constitute stock for personal holding company purposes.

Both parties agree that the use of the label "membership" does not necessarily mean petitioner has no stock and that we must examine the characteristics of memberships in petitioner in order to determine if we are to treat them as stockholdings for personal holding company purposes.[18]  See *Collateral Equities Trust*, 39 B.T.A. 834, 839 (1939).

The personal holding company tax provisions were first enacted in the Revenue Act of 1934 as a supplement to the accumulated earnings surtax.  Both had the purpose of forcing corporations to distribute after-tax earnings to stockholders (ultimately, individuals and trusts), who would then be taxed at the sharply graduated individual income surtax rates.[19]

The Senate Finance Committee, in its report on the 1936 Revenue Act (S. Rept. No. 2156, 74th Cong., 2d Sess., p. 23 (June 1, 1936)), described the 1934 Act personal holding company provisions as having proved "very effective in preventing accumulations in corporations to prevent the imposition of surtax on shareholders."  In that Act, the Revenue Act of 1937, and the 1939 and 1954 Codes, the personal holding company tax provisions were retained with changes not substantially relevant in either purpose or effect to the instant case.

On the basis of this legislative history we agree in part with respondent's analysis of the controlling factors in Rev. Rul. 58–556, *supra*—petitioner's memberships will be treated as stockholdings for

[18] The converse, that something denominated "stock" might nevertheless not constitute stock for personal holding company purposes, is not before us and we express no opinion on that issue.

[19] H. Rept. No. 704, 73d Cong., 2d Sess., p. 11 (Feb. 12, 1934) :

"Perhaps the most prevalent form of tax avoidance practiced by individuals with large incomes is the scheme of the "incorporated pocketbook." That is, an individual forms a corporation and exchanges for its stock his personal holdings in stock, bonds, or other income-producing property.  By this means the income from the property pays corporation tax, [*sic*] but no surtax is paid by the individual if the income is not distributed.

\* \* \* \* \* \* \*

"It is true that section 104 of the existing income-tax law puts a 50-percent penalty on this accumulation of profits to avoid surtaxes, but, nevertheless, there seems no doubt that this form of avoidance is still practiced to a large extent.  By making partial distribution of profits and by showing some need for the accumulation of the remaining profits, the taxpayer makes it difficult to prove a purpose to avoid taxes.

"Your committee, therefore, recommends that the present section 104 be divided into two parts, one dealing with the personal holding company and the other with all other corporations which accumulate unreasonable surpluses.  The part dealing with personal holding companies is new, while the present law has been retained with a few modifications to reach the other companies.  (See secs. 102 and 103 of the bill.)"

S. Rept. No. 558, 73d Cong., 2d Sess., p. 15 (Mar. 28, 1934) :

"The effect of this system is to provide for a tax which will be automatically levied upon the holding company without any necessity for proving a purpose of avoiding surtaxes.  It is believed that the majority of these corporations are in fact formed for the sole purpose of avoiding the imposition of the surtax upon the stockholders."

The Senate Finance Committee agreed with the concern expressed by the House Ways and Means Committee, merely changing somewhat the provisions suggested by the House Committee.  The Conference Committee adopted essentially the Senate provisions.  Conf. Rept., H. Rept. No. 1385, 73d Cong., 2d Sess., pp. 1 (Amendment No. 45) and 7 (Amendment No. 124) (Apr. 30, 1934).

personal holding company purposes if they include the right to share in petitioner's profits, either currently (as by distribution or diversion of profits) or ultimately (as on dissolution).

Although the question of what rights are sufficient to make these memberships stock is a matter of Federal tax law, the question of whether those rights exist is a matter of State law. See, e.g., *George W. S. Swenson*, 37 T.C. 124, 131 (1961), on appeal (C.A. 8), and cases cited therein; *Laura Massaglia*, 33 T.C. 379, 383.

Petitioner's charter specifically forbids distributions of income to its members and makes no provision for dissolution, but reserves broad amendment rights. The Delaware statutory provision [20] regarding charter amendments is quite broad and would be read into petitioner's charter even if the charter did not specifically include it. *Peters* v. *United States Mortgage Co.*, 13 Del. Ch. 11, 14, 114 Atl. 598, 600 (1921).

We agree with respondent's view that we must examine into all the rights exercisable by members as such in order to determine if we shall treat memberships as stock for this issue. We do not see why, if those rights include the right to amend, we should ignore the possible consequences of the exercise of that right—at least here, where the right to amend inheres solely in the members and does not involve the discretionary concurrence of others. Consequently, our inquiry is into whether petitioner's members may lawfully obtain for themselves petitioner's profits, either currently or ultimately, under petitioner's present charter or any amendments thereto which the members might lawfully make during the years before us on this question.

---

[20] Del. Code Ann. tit. 8, sec. 242(a) (1953) :

SEC. 242. Amendment of certificate of incorporation after payment of capital or where corporation has no capital stock

(a) Any corporation of this State existing prior to the tenth day of March, 1899, whether created by special act or general law, or any corporation created under the provisions of this chapter, may, from time to time, when and as desired, amend its certificate of incorporation by—

(1) Addition to its corporate powers and purposes, or diminution thereof, or both ; or

(2) Substitution of other powers and purposes, in whole or in part, for those prescribed by its certificate of incorporation ; or

(3) Increasing or decreasing its authorized capital stock or reclassifying the same, by changing the number, par value, designations, preferences, or relative, participating, optional, or other special rights of the shares, or the qualifications, limitations or restrictions of such rights, or by changing shares with par value into shares without par value, or shares without par value into shares with par value either with or without increasing or decreasing the number of shares ; or

(4) Changing its corporate title ; or

(5) Making any other change or alteration in its certificate of incorporation that may be desired.

Any or all such changes or alterations may be effected by one certificate of amendment. Every certificate of incorporation as so amended, changed or altered, shall contain only such provisions as it would be lawful and proper to insert in an original certificate of incorporation made at the time of making such amendment.

For our purposes, this provision is essentially a reenactment of Del. Rev. Code sec. 2058 (1935) (ch. 65, Corporations, sec. 26), in effect (with amendments not here relevant) during all the taxable years before the Court until the 1953 revision hereinabove set forth.

The privilege of incorporation without authorization of capital stock (Del. Code Ann. tit. 8, sec. 102(a)(4) (1953) [21]) is limited under applicable provisions of Delaware law to not-for-profit corporations. *Read* v. *Tidewater Coal Exchange*, 13 Del. Ch. 195, 116 Atl. 898 (1922); *Southerland* v. *Decimo Club*, 16 Del. Ch. 183, 142 Atl. 786 (1928). In *Read* (116 Atl. at 904), the chancellor described as follows the test of not-for-profit under the predecessor of the provisions set forth at footnote 21, herein:

> Whether dividends are expected to be paid may, generally speaking, be taken as the test by which we are to determine whether, or not, a given corporation is organized for profit. Perhaps a better way to put it would be to say that a corporation is for profit when its purpose is, whether dividends are intended to be declared or not, to make a profit on the business it does which in reason belongs to it and which if its affairs are administered in good faith would be available for dividends. Subterfuges by which a corporation allowed its profits to be diverted to those owning it, though not in the form of dividends, would manifestly not remove from the corporation its feature of profit making. Nor would a mere declaration in its certificate of incorporation that it was organized not for profit, be sufficient to stamp upon it a nonprofit character. * * *
>
> Profit furthermore must be something of a tangible or pecuniary nature. Intangible benefits not capable of measurement in definite terms, though of value to the recipients, cannot be called profits. When we speak of a corporation for profit, I take it also that we mean profit coming to, or belonging to, the corporation qua such, as distinct from its members or stockholders. Barring cases where profits are improperly diverted directly to the corporate members and not conveyed to them through the channel of the corporate treasury, which cases would rest on a distinct footing, the term "profit" as employed in the section under discussion means gain or earnings that are expected to come into the possession of the corporation.

The court held in *Read* that a corporation, whose existence as such had been attacked by one of its creditors, was truly not for profit and thereby entitled to exist as a nonstock corporation.

*Decimo* involved a bill in equity to revoke and forfeit a nonstock corporation's charter for abuse and misuse of corporate powers, privileges, and franchises. The defendant corporation's members had created a trust, beneficial interests in which were tied to membership in the corporation. The trust imposed membership dues, with which it purchased stock in a corporation created to engage in a pooled-purchasing scheme for profit. Dividends from the profit corporation went to the trust, which distributed them to the holders of its certificates of beneficial interest, a class of persons required to be identical

---

[21] The cited paragraph authorizes the issuance of classes of stock. It then provides that:

The foregoing provisions of this paragraph shall not apply to corporations which are not organized for profit and which are not to have authority to issue capital stock. In the case of such corporations, the fact that they are not to have authority to issue capital stock shall be stated in the certificate of incorporation. * * *

For our purposes, this provision is essentially a reenactment of Del. Rev. Code (1935), section 2037(4) (ch. 65, Corporations, sec. 5(4)), in effect (with amendments not here relevant) during all the taxable years before the Court until the 1953 revision hereinabove set forth.

with the class of members in the defendant nonstock corporation. Upon dissolution of the trust, its assets were to become the property of the defendant corporation. The chancellor characterized the arrangement as "a subterfuge by which the defendant, incorporated as a no-profit concern, seeks to accomplish as one of its chief purposes the end of earning pecuniary profits for its members, keeping control all the time over the operations of the venture and ultimately emerging in plain view as the absolute owner of the profit-seeking enterprise." 142 Atl. at 792. The chancellor quoted with approval the *Read* definition of "organized for profit" set forth above, concluded that the defendant before him was so organized and operated, and granted the bill to revoke the corporation's charter.

We conclude that petitioner could not have incorporated as a nonstock corporation under Delaware law in effect during the period before the Court until the 1951 amendments discussed *infra*, if it had the power to make profits for the pecuniary benefit of its members, either directly by way of distributions or indirectly by diversion of profits. The Delaware statute set forth at footnote 20, *supra*, forbids amendments which would not be "lawful and proper to insert in an original certificate of incorporation made at the time of making such amendment." Consequently, petitioner could not lawfully distribute or divert profits to its members nor could it amend its charter to empower it to do so.

On the exemption issue (Issue 3, *supra*) respondent argued that Corporation's profits on the lock construction projects and the heaters distributed to Stevens' relatives and acquaintances were diversions of petitioner's income to or on behalf of members. Although respondent does not discuss this point with regard to the personal holding company issue, we think those contentions are relevant here. We have found, upon the basis of the record before us, that petitioner was fully compensated for its involvement in the lock construction projects. See *Stevens Brothers & Miller-Hutchinson Co.*, 24 T.C. 953 (1955). Stevens testified the heaters were distributed for experimental and therapeutic purposes and respondent did not challenge petitioner's proposed finding of fact to that effect. We have accepted this testimony of Stevens. *Blodgett* v. *Holden*, 275 U.S. 142, 146 (1927); *Woodworth* v. *Kales*, 26 F. 2d 178 (C.A. 6, 1928); *Saul M. Weingarten*, 38 T.C. 75, 79 (1962).

It follows from these facts, our view of Delaware law, and the presumption that actions are in compliance with the applicable law (see *Newlin Machinery Corporation*, 28 T.C. 837, 843–844 (1957); *Washington Post Co.*, 10 B.T.A. 1077, 1078–1080 (1928), and cases cited therein) that petitioner has not "allowed its profits to be diverted to those owning it." *Read* v. *Tidewater Coal Exchange*, 116 Atl. at 904.

Delaware law provides that, on liquidation of a corporation, after debts and expenses are paid, "The trustees or receivers of a dissolved corporation * * * shall distribute and pay [any balance remaining] to and among those who shall be justly entitled thereto, as having been stockholders of the corporation, or their legal representatives." Del. Code Ann. tit. 8, sec. 281 (1953).[22] The *ratio decidendi* of *Read* and *Decimo* would require that the specific reference to "stock" in the liquidation provisions would forbid distribution of accumulated profits to members of a nonprofit, nonstock corporation on liquidation. Especially in the light of the expressed reluctance of the Delaware courts to read qualifying language into statutes (*Maddock* v. *Vorclone Corporation*, 17 Del. Ch. 39, 42, 147 Atl. 255, 256 (1929)), we conclude that petitioner's members would not be permitted to share in petitioner's profits on liquidation.[23]

However, in 1951 the Delaware Legislature amended the Revised Code of 1935 to permit consolidations or mergers between stock companies and nonstock companies.[24] This amendment applies to nonstock corporations "whether organized for profit or not organized for profit." It authorizes conversion of membership interests into "interests of value" in the resulting corporation.

[22] For our purposes, this provision is essentially a reenactment of Del. Rev. Code (1935), sec. 2077 (ch. 65, Corporations, sec. 45), in effect during all the taxable years before the Court until the 1953 revision hereinabove set forth.

[23] It may be that this reasoning would not bar distribution of surplus to the extent of each individual member's contributions to petitioner. While that may be relevant in determining whether petitioner is taxable, it appears to be of no moment for personal holding company purposes, since the latter provisions are concerned with forcing distributions of profits and not of capital.

[24] 48 Del. Laws, ch. 352, sec. 1 (approved June 15, 1951), added a new section, 2091D, to the Del. Rev. Code of 1935 (ch. 65, Corporations, sec. 59D), to read as follows:

"2091D. Sec. 59D. CONSOLIDATION OR MERGER OF NON-STOCK CORPORATIONS, ORGANIZED FOR PROFIT OR NOT FOR PROFIT, WITH STOCK CORPORATIONS; PROCEEDINGS FOR:—Any one or more non-stock corporations, whether organized for profit or not organized for profit, organized under the provisions of this Chapter, or existing under the laws of this State, may consolidate or merge with one or more stock corporations, whether organized for profit or not organized for profit, organized under the provisions of this Chapter, or existing under the laws of this State, into a single corporation * * *. [T]he directors, or a majority of them, of such stock corporations as desire to consolidate or merge and the members of the governing body, however called, or a majority of them, of such non-stock corporations as desire to consolidate or merge may enter into an agreement * * * stating * * * the manner of converting the shares of stock of a stock corporation and the interests of members of a non-stock corporation into shares or other securities of the corporation resulting from or surviving such consolidation or merger or of converting the shares of stockholders in a stock corporation and the interests of members of a non-stock corporation into membership interests of the non-stock corporation resulting from or surviving such consolidation or merger, as the case may be, with such other details and provisions as are deemed necessary; provided, however, that in such consolidation or merger the interests of members of a constituent non-stock corporation may be treated in various ways so as to convert such interests into interests of value, other than shares of stock, in the proposed new or resulting stock corporation or into shares of stock in the proposed new or resulting stock corporation, voting or non-voting, or into creditor interests or any other interests of value equivalent to their membership interests in their non-stock corporation, * * *."

These provisions were substantially reenacted as Del. Code Ann. tit. 8, secs. 257, 258 (1953).

Another section of the same amending act provided for the first time for valuation of and payment for memberships of dissenting members in the event of consolidations or mergers.[25]

The 1951 amendments here discussed contrast sharply with the 1941 amendment permitting consolidations or mergers of nonstock corporations.[26] That amendment, by its terms, applied only to "nonstock, non-profit corporations." Although the provision regarding valuation of stock of dissenting stockholders in consolidations or mergers was amended by another section of the same 1941 Act (sec. 16), no effort was there made to authorize payment for the value of memberships.

We have not found any judicial decision construing these statutes insofar as they apply to nonstock corporations, nor have any such decisions been brought to our attention.

Despite the fact that the predecessors of Del. Code Ann. tit. 8, secs. 102(a)(4), 242(a), and 281, set forth *supra*, were not amended by this 1951 Act, we conclude that the Delaware Legislature intended to and did change the law to give to members in nonstock corporations the right to share in the current or accumulated profits of those corporations. See *Commissioner* v. *Bilder*, 369 U.S. 499 (1962).

Petitioner argues that the powers of amendment so reserved cannot be exercised to change a corporation in such a manner as to make it an entirely different kind of a corporation or to change substantially its objects and purposes. It cites 7 Fletcher, Cyclopedia of the Law of Private Corporations, sec. 3718, p. 886; *Gulcz* v. *Delaware Polish Beneficial Ass'n, etc.*, 20 Del. Ch. 52, 169 Atl. 595 (1933); 13 Am. Jur., Corporations, sec. 86, p. 230; *Midland Co-operative W.* v. *Range Co-operative O. Ass'n*, 200 Minn. 538, 274 N.W. 624 (1937), 111 A.L.R. 1521, and annot., 1525; *Imperial Trust Co.* v. *Magazine Repeating Razor Co.*, 138 N.J. Eq. 20, 46 A. 2d 449 (1946). The cited Delaware case, decided before the 1951 amendments discussed above, merely reserves the question,[27] and the other cases and materials relied upon are distinguishable because of the different and more restrictive statutory provisions involved.

We are reluctant to rule on matters of State law where the courts of that State have not spoken directly. Nevertheless, we are here required to determine what Delaware law was during the taxable years before us. In light of the cited statutory provisions and the few relevant cases we have found we conclude that the courts of Dela-

---

[25] 48 Del. Laws, ch. 352, sec. 4, amending Del. Rev. Code of 1935, sec. 2093 (ch. 65, Corporations, sec. 61). This provision was substantially reenacted as Del. Code Ann. tit. 8, sec. 262(a) (1953).

[26] 43 Del. Laws, ch. 132, sec. 14, Del. Rev. Code, sec. 2091C (1935), (ch. 65, Corporations, sec. 59C) (approved Apr. 9, 1941), substantially reenacted as Del. Code Ann. tit. 8, secs. 255, 256 (1953).

[27] The same question is also reserved in *Davis* v. *Louisville Gas & Electric Co.*, 16 Del. Ch. 157, 160, 142 Atl. 654, 655 (1928).

ware would have decided the questions of State law in the manner hereinabove set forth had they been faced with those questions.

Accordingly, we hold petitioner's memberships do not, for the taxable year 1948, and do, for the taxable years 1952 through 1958 constitute "stock" for purposes of the personal holding company provisions of the 1939 and 1954 Internal Revenue Codes.

Petitioner's third argument applies only to the taxable year 1955. As to that year, it maintains that less than 80 percent of its gross income was personal holding company income within the meaning of section 543 of the 1954 Code.

Under section 7701(a)(2) of the 1954 Code [28] petitioner's relationship with Corporation regarding the construction projects is treated as a partnership and petitioner is treated as a partner. Under section 702(b) of the 1954 Code [29] petitioner's share of the Cheatham Lock project profit retains the same character to petitioner as it had to the joint venture.

The income received by petitioner from its joint venture with Corporation relating to the sale of sheet steel piling and equipment used in the Cheatham Lock project was income received from the sale of property. The property was not stock or securities. Sec. 543(a)(2), 1954 Code. The income was not of the sort includable within any of the categories of personal holding company income listed in the statute.

Although petitioner's disagreement with respondent as to the character for personal holding company purposes of the gain on the above-discussed sales was manifested to respondent before the trial and on brief, we have been given little light on respondent's view of the issue regarding petitioner's taxable year 1955.

Respondent determined petitioner was a personal holding company for its taxable year 1955 but he did not determine that petitioner's profit from the Cheatham Lock project in that year fell into any particular category of personal holding company income. See sec. 543(a), 1954 Code. Aside from his suggestions in Issues 3 and 8 that petitioner's investments in the lock construction projects were loans

---

[28] SEC. 7701. DEFINITIONS.

(a) When used in this title, where not otherwise distinctly expressed or manifestly incompatible with the intent thereof—

\* \* \* \* \* \*

(2) PARTNERSHIP AND PARTNER.—The term "partnership" includes a syndicate, group, pool, joint venture, or other unincorporated organization, through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a trust or estate or a corporation; and the term "partner" includes a member in such a syndicate, group, pool, joint venture, or organization.

[29] SEC. 702. INCOME AND CREDITS OF PARTNER.

(b) CHARACTER OF ITEMS CONSTITUTING DISTRIBUTIVE SHARE.—The character of any item of income, gain, loss, deduction, or credit included in a partner's distributive share under paragraphs (1) through (8) of subsection (a) shall be determined as if such item were realized directly from the source from which realized by the partnership, or incurred in the same manner as incurred by the partnership.

from which petitioner derived interest income, which argument we reject, respondent nowhere suggests this income falls into any of the listed categories, nor has he even stated the general proposition that it constitutes personal holding company income.[30]

Our examination of petitioner's return for its taxable year 1955 and the partnership return it filed with Corporation for calendar 1954 convinces us that less than 80 percent of petitioner's gross income for its taxable year 1955 was personal holding company income.

On this issue we hold for petitioner as to its taxable years 1948 and 1955 and for respondent as to each of petitioner's taxable years 1952 through 1954 and 1956 through 1958.

### Issue 5. Worthless Securities.

Respondent maintains petitioner has not shown that the Denver & Rio Grande and St. Louis & San Francisco securities claimed by it to have become worthless in petitioner's taxable year 1949 in fact became worthless in that year or any year before the Court. Respondent does not dispute petitioner's claimed basis in the stock.

Petitioner relies on the testimony of its president that the stock became worthless in 1949 and was therefore deductible in its taxable year 1949.[31] Petitioner argues in the alternative that, since part of the stock was purchased on the day before the start of the first year before the Court and the remaining stock purchased during that first year, and since the stock was worthless at the time of the trial, it must have become worthless during one of the years before the Court. It would be improper, petitioner maintains, to deny the deduction for all the 11 years before the Court in this proceeding merely because petitioner is unable to establish to which particular year the loss is attributable. Petitioner offers to permit respondent to choose the year of deduction.

Whatever the merits of petitioner's equitable-legal argument, we are not impressed with its factual underpinnings. Petitioner's president testified he attempted to sell the stock in 1949 and was unable to do so. We are not told what was the nature of the attempt. At what price did he offer it? Did he advertise the offer and, if so, where? See West End Pottery Co., 7 B.T.A. 927, 929 (1927). Peti-

---

[30] On brief respondent asserted petitioner conceded that the 80-percent requirement had been met for all the taxable years before the Court on this issue. On reply brief respondent conceded that this assertion was incorrect as to the taxable year 1955.

[31] SEC. 23. [1939 Code] DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

*       *       *       *       *       *       *

(g) CAPITAL LOSSES.—

*       *       *       *       *       *       *

(2) SECURITIES BECOMING WORTHLESS.—If any securities (as defined in paragraph (3) of this subsection) become worthless during the taxable year and are capital assets, the loss resulting therefrom shall, for the purposes of this chapter, be considered as a loss from the sale or exchange, on the last day of such taxable year, of capital assets.

tioner's president testified as to his belief that the stock became worthless in 1949 and that it was worthless at the time of the trial. However, this type of testimony is of little value in fixing the fact or time of worthlessness. *Boehm* v. *Commissioner*, 326 U.S. 287, 292–293 (1945).

We note that petitioner purchased Denver & Rio Grande bonds late in 1947, the same year it purchased the stock. In 1951 petitioner was able to sell those bonds for approximately 2½ times their purchase price. Although this is not conclusive evidence that the stock had a value in 1949, nevertheless it suggests the stock probably was not worthless. See *Helvering* v. *Taylor*, 293 U.S. 507 (1935).

Petitioner has failed to sustain its burden of proving the stock became worthless during the period before the Court and we therefore need not reach the question of the year in which the loss would be deductible.

On this issue we hold for respondent.

### Issue 6. Interest.

Respondent disallowed $5,308.33 of the $24,508.33 interest expense petitioner claimed on the Form 990 it filed for its taxable year 1950. In his deficiency notice and counsel's opening statement, respondent assigned no reason for the disallowance. On brief, respondent notes the testimony of petitioner's president that petitioner's officers determined the amount was paid in error and that they had contributed a fund out of which petitioner would be reimbursed for erroneous payments of that nature.

Petitioner maintains the entire amount was paid, that it was interest expense, that it was not unreasonable in amount, and that reimbursement was not made during that taxable year.

We agree with petitioner.

Petitioner's president testified as to each item of petitioner's argument noted above and this testimony was undisputed by respondent.

Respondent does not suggest the transaction was sham nor does he attempt to assert his reallocation powers under section 45 of the 1939 Code. Under these circumstances we hold petitioner has met its burden of demonstrating its entitlement to the deduction of the entire $24,508.33 interest expense for the taxable year 1950.

We note that under the law in effect during that taxable year and since, such reimbursements, when made, will constitute income to petitioner to the extent they are reimbursements of expenditures taken as deductions which reduced petitioner's tax for its taxable year 1950. Secs. 22(b) (12) (D), 1939 Code, and 111(a) (4), 1954 Code. See Rev. Rul. 58–546, 1958–2 C.B. 143, 144. Even if petitioner had been repaid after the end of its taxable year 1950, its 1950 deductions would not be affected by this repayment. *A fortiori*, since petitioner, a cash basis

taxpayer, had not been repaid even as late as the trial in this proceeding its 1950 deductions should not be affected by a mere hope or expectation of repayment.

On this issue we hold for petitioner.

### Issue 7. Algiers Lock Income.

Respondent does not explain his reallocation among petitioner's taxable years 1949, 1950, and 1951 of petitioner's income from its Algiers Lock investment except to note that it is consistent with the partnership returns filed by petitioner and Corporation for the relevant calendar years.

Petitioner concedes that if its relationship with the company is taxable as a partnership, then because of section 188 of the 1939 Code,[32] its income for those years should be allocated as respondent has determined. Apparently, petitioner itself contends that the relationship was a partnership but assigned error to respondent's determination on this issue because of respondent's alleged inconsistency between his treatment of those years and his treatment of petitioner's taxable years 1954 and 1955.

We have found this relationship to be a joint venture, taxable as a partnership (sec. 3797(a) (2), 1939 Code),[33] and accordingly hold for respondent on this issue.

### Issue. 8. Cheatham Lock Income.

The calendar 1954 partnership return filed by petitioner and Corporation reported income from the Cheatham Lock project on a completed-contract basis. The sale of steel sheet piling and equipment was reported as producing long-term capital gain. This capital gain item was then reported as such on petitioner's return for its taxable year 1955.

Respondent determined that this gain is ordinary income. His position is that these items were not capital assets under section 1221 of the 1954 Code. He argues that ownership in the steel sheet piling was transferred to the Corps of Engineers and returned to the joint venture only when the piling was pulled from the job. At that point the piling was no longer used on the job but was merely held for sale to customers. It was therefore not a capital asset. Furthermore, neither the steel sheet piling nor the equipment was held by petitioner

---

[32] SEC. 188. DIFFERENT TAXABLE YEARS OF PARTNER AND PARTNERSHIP.

If the taxable year of a partner is different from that of the partnership, the inclusions with respect to the net income of the partnership, in computing the net income of the partner for his taxable year, shall be based upon the net income of the partnership for any taxable year of the partnership (whether beginning on, before, or after January 1, 1939) ending within or with the taxable year of the partner.

[33] This provision, amended by sec. 340(a), Revenue Act of 1951, was reenacted as sec. 7701(a) (2), 1954 Code, set forth at footnote 28, *supra.*

since, by the terms of its agreement with Corporation, it did not own any of the property used in the construction project. Alternatively, respondent maintains that neither the steel sheet piling nor the equipment was held more than 6 months. Alternatively, respondent maintains that petitioner's net income from the Cheatham Lock project was interest income.

On reply brief, petitioner concedes that the property did not constitute capital assets under section 1221 but maintains the property was used in its trade or business within the meaning of section 1231(a); that it was subject to depreciation; and that it was held for more than 6 months. As to the steel sheet piling, petitioner maintains that it was not transferred to the Corps of Engineers at any time.

We agree with respondent's conclusion that petitioner's profit on the sale of these items is taxable as ordinary income and not as capital gain.

An essential part of the definition of "property used in the trade or business" within the meaning of the provision petitioner relies upon [34] is that it is subject to an allowance for depreciation.

Stevens testified as to the equipment and stated that it had been depreciated and that, up to the time of the trial, the Internal Revenue Service had not questioned the decision to depreciate this property.

The schedule attached to the partnership return petitioner filed with Corporation for calendar 1954 does not sufficiently indicate the nature of the equipment to permit us to determine whether it is depreciable. We note an explanation on the schedule indicating that the profit from the sale of that equipment equaled its sales price less the commission paid on the sale, suggesting that the entire cost of the equipment had been used to offset ordinary income either as depreciation or as cost of materials. Another schedule on that return indicates that details of the depreciation deduction are to be found on Corporation's tax return. Corporation's return was not submitted into evidence. Stevens' testimony as to the legal conclusion of depreciability does not fill the gap. Petitioner has failed to sustain its burden of proof.[35]

Since the completed-contract method of accounting for profits on the Cheatham Lock construction project was used in the partnership return, all income and expense items for the entire project were taken in one year. If the profits are treated in entirety as ordinary income,

---

[34] SEC. 1231. [1954 Code] PROPERTY USED IN THE TRADE OR BUSINESS AND INVOLUNTARY CONVERSIONS.

(b) DEFINITION OF PROPERTY USED IN THE TRADE OR BUSINESS.—For purposes of this section—

(1) GENERAL RULE.—The term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167, held for more than 6 months, * * *

[35] Since petitioner first relied upon section 1231 of the 1954 Code on reply brief, we do not interpret respondent's silence on the depreciation issue as implicit acquiescence in petitioner's view of the facts. Cf. Blodgett v. Holden, 275 U.S. 142; Woodworth v. Kales, 26 F. 2d 178; Saul M. Weingarten, 38 T.C. 75.

as respondent here proposes, it makes no difference if one part is reduced by depreciation and another part increased in the same amount by virtue of a reduction in basis. Consequently, we do not infer that respondent allowed for depreciation on this equipment from the fact that respondent neglected to go through the motions of changing all of the different items that would have to be changed if he were to disallow the depreciation.

Another essential part of the definition of "property used in the trade or business" within the meaning of section 1231, *supra*, is that the property has been held for more than 6 months.

Stevens testified as follows regarding the steel sheet pilings:

Q. Did the contractors transfer ownership of that piling to the corps of engineers?
A. Only for the time that was required on the lock, a rather indefinite time. We couldn't dispose of it.
Q. You couldn't, you say you couldn't dispose of it?
A. As long as we needed it on this job.
Q. Did you transfer ownership of it to the corps?
A. That I couldn't answer.

This testimony raises substantial doubts as to whether the joint venture held the steel sheet pilings more than 6 months. On brief, petitioner maintains this property was never transferred to the Corps of Engineers. Petitioner's counsel seeks to attack Stevens' testimony as being "consistent with Mr. Stevens' age and his observable limitation of hearing." However, the possibility of transfer to the Corps of Engineers was raised by petitioner's counsel at the hearing and not by Stevens. We do not find in the record evidence convincing us that it would be unjust to bind petitioner to the testimony of its own witness, who is also its president.

Petitioner makes much of the fact that respondent failed to submit the Corps of Engineers' copy of the Cheatham Lock contract, for which submission the record was kept open after the trial. However, in the absence of a showing that the contract was unavailable to petitioner, and in the light of the fact that petitioner wishes to use the contract to contradict a part of the testimony of its own witness, we decline to read this failure to submit the contract as an admission on the part of respondent that the sheet steel pilings had never been transferred to the Corps of Engineers. On the record that the parties have made in this case we must conclude that they were transferred to the Corps of Engineers. We have no information as to when the pilings were transferred back to the joint venture or any of the joint venturers and so we must conclude that petitioner has failed to sustain its burden of proving that it or the joint venture held the steel sheet pilings for more than 6 months.

Petitioner has failed to meet its burden of proving that the sale of either category of property involved in this issue gave rise to capital gains.

In petitioner's reply brief it is stated that Corporation's share of profits from the sales here at issue was "treated by respondent as gain from the sale of depreciable assets as provided by Sec. 117(j) of the 1939 Code and Sec. 1231(a) of the 1954 Code." Since no offer was made to submit evidence regarding respondent's treatment of Corporation's share of this income we decline to consider what effect such evidence, if submitted, would have on this proceeding.

On this issue we hold for respondent.

### Issue 9. Failure to File Returns.

Respondent maintains petitioner failed to sustain its burden of proving that its failure to file income tax returns for its taxable years 1948 through 1954 and personal holding company tax returns for its taxable years 1948, 1952, 1953, and 1954 was due to reasonable cause and not to willful neglect. Respondent concludes that petitioner is liable under section 291(a) of the 1939 Code [36] for additions to tax in the amount of 25 percent for each of those years.

Petitioner relies on its exemption certificate, which specifically stated it need file only information returns for those years. Petitioner maintains that this, together with advice of an attorney obtained after respondent revoked the certificate, are sufficient to constitute reasonable cause for failure to file. Petitioner does not argue on this issue that the information returns it filed satisfied its obligation to file returns for those years. Cf. *Germantown Trust Co.* v. *Commissioner*, 309 U.S. 304 (1940); *McKinley Corporation of Ohio*, 36 T.C. 1182 (1961).

We agree with respondent for all the years and all the returns before us on this issue except the personal holding company tax return for petitioner's taxable year 1948. The addition to tax for that return falls, in consequence of our determination (Issue 4, *supra*) that petitioner was not a personal holding company for that year. *Sebago Lumber Co.*, 26 T.C. 1070 (1956).

Ignorance of the law's requirements does not constitute a reasonable cause for failure to fulfill those requirements—here, failure to file a timely return. *West Side Tennis Club*, 39 B.T.A. 149 (1939), affd. 111 F. 2d 6 (C.A. 2, 1940). On the other hand, it is accepted that good faith reliance on the advice of competent tax counsel that a re-

---

[36] SEC. 291. FAILURE TO FILE RETURN.

(a) In case of any failure to make and file return required by this chapter, within the time prescribed by law or prescribed by the Commissioner in pursuance of law, unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the tax: 5 per centum if the failure is for not more than thirty days with an additional 5 per centum for each additional thirty days or fraction thereof during which such failure continues, not exceeding 25 per centum in the aggregate. * * *

130

turn need not be filed, where such advice was timely sought and was based on full knowledge of the relevant facts, does constitute reasonable cause for failure to file a return. *C. R. Lindback Foundation*, 4 T.C. 652, 667 (1945), affd. 150 F. 2d 986 (C.A. 3, 1945). *A fortiori*, one is entitled to rely on an exemption certificate issued by respondent, provided respondent is not misinformed as to the facts.

However, an acceptable reason for failure to file a return will excuse such failure only so long as the reason remains valid. On August 24, 1954, respondent revoked petitioner's certificate of exemption. From that point on, the revoked exemption certificate could no longer constitute reasonable cause for failure to file returns for the years prior to 1954.

Nothing in this record shows that Stevens' efforts to determine the reasons for the revocation, his consultations with private attorneys (we are not told when they occurred), or his conference with respondent's employee, Oberg (conference held in 1960), elicited the advice that returns should not be filed.[37] We note that petitioner did file timely returns for each of its next 4 taxable years, each with a protest noted prominently on its first page, disclaiming any implied waiver of petitioner's position as to tax exemption.

In view of the general nature of the obligation of filing returns and the specific admonishment by the Commissioner's subordinates that petitioner should file returns for the specified years it is not too much to expect that "ordinary business care and prudence" (*Charles E. Pearsall & Son*, 29 B.T.A. 747, 749 (1934); Regs. 111, sec. 29.291–1; Regs. 118, sec. 39.291–1(b)) would require petitioner to secure expert advice specifically on this point before ignoring the Commissioner's justifiable directions. The evidence fails to show petitioner obtained any advice regarding the filing of returns for the years before us on this issue.

We conclude that petitioner has failed to show that its failure to file the returns required of it for its taxable years 1948 through 1954 was due to reasonable cause and not to willful neglect.

Petitioner cites to us *Economy Savings & Loan Co.* v. *Commissioner*, 158 F. 2d 472 (C.A. 6, 1946), reversing in part 5 T.C. 543 (1945); *Palm Beach Trust Co.* v. *Commissioner*, 174 F. 2d 527 C.A.D.C. 1949), reversing in part 9 T.C. 1060 (1947); *E. D. Gensinger*, 18 T.C. 122 (1952), reversed on other issues 208 F. 2d 576 (C.A. 9, 1953); *Stockstrom* v. *Commissioner*, 190 F. 2d 283 (C.A.D.C.

[37] Stevens' testimony regarding his conference with his attorney is not sufficient to persuade us that the attorney advised Stevens that despite the revocation petitioner should not file returns for the earlier years. See, e.g., *John Balcstreri*, 47 B.T.A. 241, 243 (1942). See also *Coates* v. *Commissioner*, 234 F. 2d 459 (C.A. 8, 1956), affirming an unreported Memorandum Opinion of this Court. The Court of Appeals there affirmed our decision that when a taxpayer submitted his books and records to his accountant, upon whom he had relied for the tax advice for 15 years, and the accountant failed to specifically advise him not to file a declaration of estimated tax, that his failure to file a timely declaration was not due to reasonable cause.

1951), reversing 14 T.C. 652 (1950) ; and *United States* v. *Eversman*, 133 F. 2d 261 (C.A. 6, 1943).

The filing of a return in the circumstances before us on this issue is not the "fruitless ritualistic measure" condemned in *Eversman*, for it is specifically commanded by statute, disregard of which results in imposition of a substantial penalty and it serves a significant purpose in the system of income taxation devised by the Congress. Nor are we faced with the *Stockstrom* situation in which a responsible Government official, with full knowledge of the facts, advised a taxpayer that he was not liable for the tax. Nor has respondent here followed in the footsteps of petitioner's error, as did the Commissioner in *Gensinger*, where a deficiency notice was first issued for the short taxable year for which the taxpayer had improperly filed a return.

In *Economy Savings* and *Palm Beach* the taxpayers introduced no evidence regarding the nature of their reasons for failure to file the returns in question but merely relied on the reasonableness of their belief that they were not liable for the tax. In each case the appellate court agreed with our view that the taxpayers were liable for the tax but reversed our determination that the taxpayer was liable for the additions to tax for failure to file returns.

The Circuit Court of Appeals in *Economy Savings* felt that the taxpayer's real belief that no excess profits tax return was required was based upon reasonable grounds. The Court of Appeals in *Palm Beach* merely stated in its per curiam opinion that "there was a question debatable in good faith" concerning the taxpayer's liability for the personal holding company surtax. Apparently those courts' view of what constitutes a question "debatable in good faith" does not depend upon the closeness of the division of judicial opinion, for both appellate courts were unanimous in affirming this Court's view as to the debatable question—whether those taxpayers were liable for the taxes. Both cases had been reviewed by the full Tax Court and there were no dissents in *Economy Savings* and only one in *Palm Beach* on the question of tax liability. From this record we conclude the rule of those cases to be that any real, nonfrivolous dispute concerning liability for a particular tax constitutes reasonable cause for failure to file the appropriate return, regardless of whether the taxpayer can show that competent, fully informed tax counsel advised him not to file the return.

With this rule we cannot agree.

Since the Congress has not defined "reasonable cause" in the statute, we must examine the legislative history of that provision and give that content to the words that would best serve what we gather to have been Congress' purpose in enacting the provision. We find no indication in the committee reports regarding this matter and so we turn to the predecessors of this provision.

Although the history of the failure to file addition [38] shows a congressional trend toward decreasing severity between 1909 and 1936, nevertheless the substantial size of the addition to tax and the fact that the trend halted between 1936 and the years before the Court on this issue suggest Congress took a dim view of failure to file a return. This is understandable, for, as Mr. Justice Jackson speaking for a unanimous Supreme Court noted with regard to income tax and personal holding company tax returns, the requirement of timely filing on appropriate returns "implements the system of self-assessment which is so largely the basis of our American scheme of income taxation. The purpose is not alone to get tax information in some form but also to get it with such uniformity, completeness, and arrangement that the physical task of handling and verifying rates may be readily accomplished." *Commissioner* v. *Lane-Wells Co.*, 321 U.S. 219, 223 (1944).

Much room may be found for disagreement as to the proper treatment of items on one's tax returns. Elaborate mechanisms have been devised to assure the taxpayer of opportunity to contest the actions of the tax collector. Petitioner's presence in this proceeding is proof that the taxpayer is entitled to a judicial decision before he may be compelled to pay the tax allegedly due from him.

However, our income tax system depends in the first instance on disclosure by the taxpayer, on forms prescribed and furnished for the purpose by the Commissioner according to law, of the information upon which a tax liability may be based. The history of our Code provisions indicates the great concern of the Congress that the Commissioner be informed annually of the elements of the taxpayer's taxable income. So it is, for example, that an assessment may normally be made only within 3 years after the filing of a return (sec. 275(a), 1939 Code) but it may be made at any time if no return has been filed. Sec. 276(a), 1939 Code. The longer statute of limitations applicable when a taxpayer omits from gross income an amount properly includable therein which exceeds 25 percent of the gross income reported (sec. 275(c), 1939 Code) may be avoided if the taxpayer notes with sufficient detail the information regarding the omitted item on the return, even though he fails to include it in income. *Colony, Inc.* v. *Commissioner*, 357 U.S. 28 (1958); *Slaff* v. *Commissioner*, 220 F. 2d 65 (C.A. 9, 1955).

---

[38] The amount of the addition was reduced from 50 percent (sec. 38 (Fifth), Revenue Act of August 5, 1909) to 25 percent (sec. 1317, Revenue Act of 1918), to 5 percent per 30 days or part thereof up to a maximum of 25 percent (sec. 406, Revenue Act of 1935); reasonable cause was extended from an excuse merely for tardy filing to an excuse for complete failure to file (sec. 291, Revenue Act of 1936).

We have many times asserted the view that the taxpayer's belief (and the belief of the appropriate fiduciary, officer, or agent of a non-individual taxpayer) that it is not liable for a tax is not sufficient to constitute reasonable cause for failure to file a return. See, e.g., *West Side Tennis Club, supra.* Even when the taxpayer shows that he relied upon advice that a return need not be filed, we have upheld imposition of the failure to file addition in the absence of a showing that the advice itself was timely sought (e.g., *Estate of Charles Curie,* 4 T.C. 1175, 1185 (1945) ) and that it was given by a competent tax adviser (e.g., *Hermax Co.,* 11 T.C. 442 (1948), affd. 175 F. 2d 776 (C.A. 3, 1949) ) fully informed as to the facts of the case. E.g., *Given* v. *Commissioner,* 238 F. 2d 579 (C.A. 8, 1956), affirming a Memorandum Opinion of this Court.

We have found very few cases in which the Court's opinion indicates the argument had been made as plainly as that apparently accepted by the appellate courts in *Palm Beach* and *Economy Savings*—failure to file a return is due to reasonable cause where there is a "question debatable in good faith" as to the liability of the taxpayer for the tax. This argument was rejected in *Fides, A. G.* v. *Commissioner,* 137 F. 2d 731, 735 (C.A. 4, 1943), affirming 47 B.T.A. 280 (1942) ; *Southeastern Finance Co.,* 4 T.C. 1069, 1087 (1945), affd. 153 F. 2d 205 (C.A. 5, 1946) ; *A. C. Monk & Co.,* 10 T.C. 77, 83 (1948) ; *Elizabeth Lewis Saigh,* 36 T.C. 395, 430 (1961).

The "reasonable argument" or "question debatable in good faith" doctrine seems to us to be inconsistent with the test generally imposed regarding advice of counsel. If a taxpayer has a reasonable (though unsuccessful) argument as to liability, why should it matter, under the view expressed by the appellate courts in *Palm Beach* and *Economy Savings*, whether this argument was suggested to the taxpayer by qualified counsel. Yet this Court is in the mainstream of judicial approach when it inquires into the source of the taxpayer's advice in determining the existence of reasonable cause. E.g., *West Side Tennis Club,* 39 B.T.A. 149 (1939) affd. 111 F. 2d 6 (C.A. 2, 1940) (Did the taxpayer's efforts to maximize income from Davis Cup matches cause it to lose its exemption?) ; *Genevra Heman,* 32 T.C. 479 (1959), affd. 283 F. 2d 227 (C.A. 8, 1960) (Was redemption of stock in exchange for cancellation of a debt, concededly for a bona fide business purpose, essentially equivalent to a dividend?) ; *Abraham J. Muste,* 35 T.C. 913 (1961) (Was it constitutional to impose an income tax on a taxpayer whose religious views forbade him to support war, if such tax went to pay for armaments or other war expenses?) ; *Eleanor C. Shomaker,* 38 T.C. 192 (1962), on appeal

(C.A. ·8, Sept. 10, 1962) (Was that part of alimony payments intended for the support of minor children taxable to the mother where the decree did not fix, in terms, the amount so allocable? The return was filed late, but more than 1 year before the Supreme Court's decision in *Commissioner* v. *Lester*, 366 U.S. 299 (1961).) In each of those cases the addition was imposed, despite the taxpayer's reasonable argument on the issue of tax liability, because of the taxpayer's failure to show timely reliance on the advice of competent, informed tax counsel that no return was required.

The language of this Court in *Southern Maryland Agricultural Fair Association, supra* at 553–554, involved the pre-1936 additions to tax provisions but is nevertheless applicable here:

> Although this petitioner was encouraged by the action of the Commissioner to believe that it would not have to file returns for 1923 and subsequent years, nevertheless, it was never prevented from filing returns. It could have filed returns and might thereby have started the period of limitations, though still claiming exemption. Some taxpayers take such precautionary steps. There is no inequity in requiring this petitioner to pay the taxes actually imposed upon it by the revenue acts. It could have avoided the inequity of the penalties by filing returns promptly after it learned of the correctness of the ruling in 1937, but it chose not to file any returns for the years here involved, apparently hoping thereby to avoid both tax and penalty. Having made the choice, it must abide by it and take the consequences.

We adhere to our position, as applied to the facts of this case, that petitioner's arguments on the issues of tax exemption and personal holding company are not sufficient to constitute reasonable cause for failure to·fulfill the statutory requirements of filing income tax returns for the taxable years 1948 through 1954 and personal holding company tax returns for its taxable years 1952 through 1954.

We have held that petitioner was not a personal holding company for the taxable year 1948. It therefore was not obliged to file a personal holding company return for that year. Since the failure to file in the case of each of the other returns required to be filed for the taxable years before us on this issue extended for more than 4 months, imposition of the maximum 25-percent addition in the case of each of those returns is, sustained. Except for adjustments in amount occasioned by adjustments in petitioner's taxable income, our decision as to the personal holding company issue for petitioner's taxable year 1948, and respondent's concession as to additions to tax for the taxable years 1955 through 1958, all of which will be given effect in the Rule 50 computation, we find for respondent on this issue.

*Decision will be entered under Rule 50.*